757 F.2d 557
 77 A.L.R.Fed. 751, 53 USLW 2470, 2
Fed.R.Serv.3d 628
 Irvin E. EASH and Yvonne M. Eash, his wife
v.
RIGGINS TRUCKING INC., a corporation, Riggins Trucking, an
unincorporated association, Riggins Trucking, a partnership,
Riggins Trucking, a corporation, Riggins Trucking Company,
an unincorporated association, Riggins Trucking Company, a
partnership, Riggins Trucking Company, a corporation,
Clifford Riggins, an individual, and Alice Ann Riggins, an
individual.
Appeal of RIGGINS TRUCKING COMPANY, a corporation, Clifford
Riggins, an individual, Alice Ann Riggins, an
individual, and William R. Tighe,
Attorney for the defendants above named.
 No. 83-5664.
 United States Court of Appeals,
Third Circuit.
 Submitted In Banc Nov. 13, 1984.
Decided March 15, 1985.
 
 William R. Tighe, Edward A. Schenck, Tighe, Evan & Ehrman, Pittsburgh, Pa., for appellants.
 Robert J. Bartow, Philadelphia, Pa., amicus curiae.
 Before ALDISERT, Chief Judge, and SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This appeal presents an issue important to judicial administration, namely, whether a district court may order an attorney to pay to the government the cost of impanelling a jury for one day as a sanction for the attorney's abuse of the judicial process.
 
 
 2
 * The underlying action in this case was a personal injury suit brought in a Pennsylvania state court in 1982 by plaintiffs Irvin and Yvonne Eash. Upon motion by the defendants, the case was removed to the District Court for the Western District of Pennsylvania, pursuant to 28 U.S.C. Sec. 1441 (1982). Settlement negotiations took place between the parties in the spring of 1983, leading to a stipulation to dismiss the case. Consequently, on August 1, 1983, the district court dismissed the action.
 
 
 3
 On August 12, 1983, without giving notice to the parties or conducting a hearing, the district court entered an order requiring defendants' counsel to pay $390 to the Clerk of Court. A copy of the order appears in the appendix. The case was scheduled for trial before a jury on May 23, 1983, and according to the district court judge, plaintiffs' attorney made repeated attempts to communicate with defendants' counsel regarding settlement possibilities during the week of May 16, 1983. Receiving no response, plaintiffs' attorney prepared for trial and came to court on May 23. At that point, defendants' counsel proposed a settlement figure that plaintiffs accepted. The district court believed, although this is disputed, that because defendants' attorney was scheduled for trial in state court that same day, the settlement avoided a scheduling conflict.
 
 
 4
 The district court concluded that under the circumstances "settlement on the eve of trial was not justified. Defendants' attorney was given adequate notice by plaintiffs' counsel and by court personnel to attempt to reach an agreement." App. at 8A. The court therefore imposed a sanction of $390 on defendants' attorney, calculated as follows: $30, the per diem fee for each juror, multiplied by 13, the minimum number of persons necessary to select a jury. Subsequently the court denied a petition for reconsideration submitted by defendants' counsel, in which counsel disputed the factual basis of the order.
 
 
 5
 After a timely appeal was filed, the case was listed for resolution by a panel of this Court.[1] Because of the importance of the questions presented, however, the Court in banc has reviewed the case.
 
 II
 
 6
 We first address appellants' contention that the district court was without jurisdiction to enter the order imposing the sanction because the order was entered eleven days after the dismissal of the case. It is clear that there are various contexts in which the district court retains jurisdiction over particular matters after a judgment has been entered. For example, the court retains jurisdiction to fix costs under Fed.R.Civ.P. 54(d) and Fed.R.Civ.P. 58, even after dismissal of the underlying action. See 10 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2668 (1983); cf. Richards v. Government of Virgin Islands, 579 F.2d 830, 833 (3d Cir.1978). In addition, courts generally have recognized that there is retained jurisdiction to assess attorney's fees pursuant to 28 U.S.C. Sec. 1927 (1982), within a reasonable time after a judgment on the merits is entered. See, e.g., Overnite Transportation Co. v. Chicago Industrial Tire Co., 697 F.2d 789, 793 (7th Cir.1983); Obin v. District of the International Assoc. of Machinists & Aerospace Workers, 651 F.2d 574 (8th Cir.1981).
 
 
 7
 Assuming the district court had the authority to impose the sanction in this matter, we find no jurisdictional obstacle to the entry of the order in question eleven days after the underlying case was disposed of on the merits.
 
 III
 
 8
 Counsel also challenges the district court's power to impose the cost of impanelling a jury as a sanction for his misconduct. The district court did not specify the authority upon which it relied; however, there appear to be two possible sources: 28 U.S.C. Sec. 1927 (1982) or the court's inherent power.
 
 
 9
 As amended in 1980, 28 U.S.C. Sec. 1927 states:
 
 
 10
 Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.
 
 
 11
 A threshold question is whether the terms "costs" and "expenses" contained in the statute include the per diem juror fees paid by the government. If not, the statute would appear to provide no authority for the order in question.
 
 
 12
 In Roadway Express, Inc. v. Piper, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), the Supreme Court held that "costs" under Sec. 1927 are limited to those costs permitted under 28 U.S.C. Sec. 1920 (1982), which enumerates the items that ordinarily may be taxed to a losing party.[2] The Court reasoned that Sec. 1927 should be read in pari materia with Sec. 1920 because the two sections are part of an integrated legislative effort, first approved in 1853, to allow the award of excess costs against lawyers who vexatiously multiply litigation. 447 U.S. at 760, 100 S.Ct. at 2461. The Supreme Court concluded that the
 
 
 13
 most reasonable construction is that the [original Act containing the present Sec. 1920] defined those costs that may be recovered from counsel. Congress, of course, may amend these provisions that derive from the 1853 Act. In the absence of express modification of those provisions by Congress, however, we should not look beyond the Act for the definition of costs under Sec. 1927.
 
 
 14
 Id. at 760, 100 S.Ct. at 2461 (footnote omitted).[3] Neither Sec. 1920 nor Sec. 1927 contains reference to the costs of impanelling a jury, costs which customarily are borne by the government. Only the opposing litigants' costs and expenses incurred by virtue of an attorney's misconduct are within the ambit of the statutes. Thus, the Supreme Court's decision in Roadway precludes reliance on Sec. 1927 as granting district courts the authority to impose the sanction employed in this case. See also United States v. Blodgett, 709 F.2d 608 (9th Cir.1983); United States v. Ross, 535 F.2d 346 (6th Cir.1976) (Sec. 1927 does not authorize assessment of juror costs).[4]
 
 IV
 A.
 
 15
 The amicus suggests that the district court's order is most properly viewed as an exercise of the court's inherent power. That courts have inherent powers--powers vested in the courts upon their creation, see Michaelson v. United States, 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924); Ex parte Robinson, 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1874); Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 227, 5 L.Ed. 242 (1821), and not derived from any statute, see Link v. Wabash Railroad Co., 370 U.S. 626, 630, 82 S.Ct. 1386, 1388, 8 L.Ed.2d 734 (1962); United States v. Hudson, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)--is not disputed. Inherent power has been frequently invoked by the courts to regulate the conduct of the members of the bar as well as to provide tools for docket management. Courts have thus relied on the concept of inherent power to impose several species of sanctions on those who abuse the judicial process. For example, federal courts may dismiss a case for failure to prosecute, Link v. Wabash Railroad Co., 370 U.S. at 629-30, 82 S.Ct. at 1388-89; see also National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam); Titus v. Mercedes Benz of North America, 695 F.2d 746 (3d Cir.1982). Similarly, the contempt power is rooted in the inherent power of the judiciary. E.g., Levine v. United States, 362 U.S. 610, 615, 80 S.Ct. 1038, 1042, 4 L.Ed.2d 989 (1960). Commentators have also noted occasions in which, under its inherent power, a court has disbarred, suspended from practice, or reprimanded attorneys for abuse of the judicial process. See Comment, Financial Penalties Imposed Directly Against Attorneys in Litigation Without Resort to the Contempt Power, 26 UCLA L.Rev. 855, 856 (1979); Comment, Involuntary Dismissal for Disobedience or Delay: The Plaintiff's Plight, 34 U.Chi.L.Rev. 922, 937 n. 96 (1967); accord Ex parte Wall, 107 U.S. 265, 288-89, 2 S.Ct. 569, 588-89, 27 L.Ed. 552 (1883); cf. Spevack v. Klein, 385 U.S. 511, 524, 87 S.Ct. 625, 633, 17 L.Ed.2d 574 (1967) (Harlan, J., dissenting) (courts "have endeavored to regulate the qualification and practice of lawyers, always in hope that this might better assure the integrity and evenhandedness of the administration of justice ... since the 17th century"). This Court has stated that in the absence of a statute, the taxation of costs in the appellate court "is a matter, inherently and necessarily within its general powers." See Island Development Co. v. McGeorge, 37 F.2d 345, 345 (3d Cir.1930); see also Levin & Amsterdam, Legislative Control Over Judicial Rule-Making: A Problem of Constitutional Revision, 107 U.Pa.L.Rev. 1, 16 (1958). Courts, pursuant to inherent powers, have declared attorneys who choose to be absent from docket call "ready for trial," even though this may lead ineluctably to the entry of a default judgment. Williams v. New Orleans Public Service, Inc., 728 F.2d 730, 732 (5th Cir.1984); see also Schlesinger v. Teitelbaum, 475 F.2d 137, 142 (3d Cir.), cert. denied, 414 U.S. 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973) (an inherent power to set counsel fees in cases involving persons of presumed incapacity).
 
 
 16
 Despite historical reliance on inherent powers, including Supreme Court jurisprudence dating back to 1812, the notion of inherent power has been described as nebulous,[5] and its bounds as "shadowy." See Rosenberg, Sanctions to Effectuate Pretrial Discovery, 58 Colum.L.Rev. 480, 485 (1958). The conceptual and definitional problems regarding inherent power that have bedeviled commentators for years, see Burbank, Sanctions in the Proposed Amendments to the Federal Rules of Civil Procedure: Some Questions About Power, 11 Hofstra L.Rev. 997, 1004 (1983); see also Sanctions Imposable, supra n. 5, stem from several factors. First, perhaps because federal courts infrequently resort to their inherent powers or because such reliance most often is not challenged, very few federal cases discuss in detail the topic of inherent powers. Cf. Note, Power of Federal Courts to Discipline Attorneys for Delay in Pretrial Procedure, 38 Notre Dame Law. 158, 161 (1963).[6] More importantly, those cases that have employed inherent power appear to use that generic term to describe several distinguishable court powers. Cf. Williams, The Source of Authority for Rules of Court Affecting Procedure, 22 Wash.U.L.Q. 459, 473-74 (1937); Frankfurter & Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts--A Study in Separation of Powers, 37 Harv.L.Rev. 1010, 1023 (1924). To compound this lack of specificity, courts have relied occasionally on precedents involving one form of power to support the court's use of another. See Burbank, supra, 11 Hofstra L.Rev. at 1005.
 
 
 17
 These observations suggest that it is not always possible to categorize inherent power decisions. Nevertheless, it appears that the term inherent power has been employed in three general fashions. The first stems from the fact that once Congress has created lower federal courts and demarcated their jurisdiction, the courts are vested with judicial powers pursuant to Article III. This use of inherent power, which might be termed irreducible inherent authority, encompasses an extremely narrow range of authority involving activity so fundamental to the essence of a court as a constitutional tribunal that to divest the court of absolute command within this sphere is really to render practically meaningless the terms "court" and "judicial power." See Levin & Amsterdam, supra, 107 U.Pa.L.Rev. at 30-32. In this limited domain of judicial autonomy, courts may act notwithstanding contrary legislative direction. These inherent powers are grounded in the separation of powers concept, because to deny this power "and yet to conceive of courts is a self-contradiction." Frankfurter & Landis, supra, 37 Harv.L.Rev. at 1023; see Levin & Amsterdam, supra, 107 U.Pa.L.Rev. at 33; see also United States v. Klein, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1872).
 
 
 18
 Boundaries for this sphere of minimal judicial integrity are not possible to locate with exactitude.[7] Certainly the power must be exercised with great restraint and caution. Whatever the proper limit of this form of inherent power may be, it is not the power to which the amicus has pointed as authority for the sanction imposed by the district court here.
 
 
 19
 The second, and most common, use of the term "inherent power" encompasses those powers sometimes said to arise from the nature of the court, see Ex parte Terry, 128 U.S. 289, 303, 9 S.Ct. 77, 79, 32 L.Ed. 405 (1888); United States v. Hudson, 11 U.S. (7 Cranch) at 34, 3 L.Ed. 259, but more often thought to be the powers "necessary to the exercise of all others." E.g., Roadway, 447 U.S. at 764, 100 S.Ct. at 2463 (quoting Hudson ). Here courts are referring to powers implied from strict functional necessity. In Roadway the Supreme Court termed the contempt sanction "the most prominent" of these powers.[8] Historically, it has viewed this particular power as "essential to the administration of justice," Michaelson, 266 U.S. at 65, 45 S.Ct. at 20, and "absolutely essential" for the functioning of the judiciary. Levine v. United States, 362 U.S. 610, 616, 80 S.Ct. 1038, 1042, 4 L.Ed.2d 989 (1959); see also Cooke v. United States, 267 U.S. 517, 539, 45 S.Ct. 390, 396, 69 L.Ed. 767 (1925); Myers v. United States, 264 U.S. 95, 103, 44 S.Ct. 272, 273, 68 L.Ed. 577 (1924).
 
 
 20
 Because this second form of inherent power arises from necessity, on several occasions the Supreme Court has stated that while the authority "may be regulated within limits not precisely defined," it can "neither be abrogated nor rendered practically inoperative." Michaelson, 266 U.S. at 66, 45 S.Ct. at 20. Indeed, in one of its earliest decisions regarding the contempt power, the Supreme Court observed that congressional enactment of a contempt statute should "be considered, only as an instance of abundant caution, or a legislative declaration, that the power of punishing for contempt shall not extend beyond its known and acknowledged limits...." Anderson, 19 U.S. (6 Wheat.) at 226, 5 L.Ed. 242; see also Cammer v. United States, 350 U.S. 399, 404, 76 S.Ct. 456, 458, 100 L.Ed. 474 (1956); United States v. Hall, 198 F.2d 726, 728 (2d Cir.1952), cert. denied, 345 U.S. 905, 73 S.Ct. 641, 97 L.Ed. 1341 (1953) (statute merely "defines the acts toward which it may be directed").
 
 
 21
 The third form of authority subsumed under the general term inherent power implicates powers necessary only in the practical sense of being useful. An early example is Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920), in which the Supreme Court determined that "the court possesses the inherent power to supply itself" with an "auditor" to aid in its decisionmaking. Id. at 312, 40 S.Ct. at 547. "Courts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties," and to appoint "persons unconnected with the court to aid judges in the performance of specific judicial duties." Id., see also Ruiz v. Estelle, 679 F.2d 1115, 1161 (5th Cir.1982), cert. denied, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); Schwimmer v. United States, 232 F.2d 855, 865 (8th Cir.), cert. denied, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956).[9]
 
 
 22
 This third category of inherent power has sometimes been said to be "rooted in the notion that a federal court, sitting in equity, possesses all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion." ITT Community Development Corp. v. Barton, 569 F.2d 1351, 1359 (5th Cir.1978); cf. Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973) (courts possess "inherent equitable power"); Johnston v. Marsh, 227 F.2d 528, 531 (3d Cir.1955) ("Our Federal judiciary has consistently recognized that at common law this inherent power existed."). In other cases this power is said to derive from necessity; for example, the court termed "essential" the appointment of an auditor in Peterson, 253 U.S. at 312, 40 S.Ct. at 547. Yet it is clear that such power is necessary only in the sense of being highly useful in the pursuit of a just result. See Note, Compulsory Reference in Actions at Law, 34 Harv.L.Rev. 321, 324 (1921).
 
 
 23
 As suggested by the above quotation from Peterson, courts may exercise this kind of inherent power only in the absence of contrary legislative direction. See Williams, supra, 22 Wash.U.L.Q. at 473; see also Alyeska Pipeline Service v. Wilderness Society, 421 U.S. 240, 259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) ("These exceptions are unquestionably assertions of inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress ....").
 
 
 24
 The third form of power has also been invoked as "the underlying federal basis that permits the court to elect to use" a state mechanism for certification of a question of doubtful state law, Weaver v. Marine Bank, 683 F.2d 744 (3d Cir.1982); in order to grant bail in a situation not dealt with by statute, Johnston v. Marsh, 227 F.2d at 531; see also Wright v. Henkel, 190 U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903); In re Gannon, 27 F.2d 362, 363 (E.D.Pa.1928); and to dismiss a suit pursuant to the doctrine of forum non conveniens, Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 502, 507, 67 S.Ct. 839, 840, 842, 91 L.Ed. 1055 (1947).
 
 
 25
 Courts rarely have explained exactly what kind of authority they mean to invoke when using an inherent power to sanction an attorney. See Dowling, The Inherent Power of the Judiciary, 21 A.B.A.J. 635 (1935). Nevertheless, it seems quite clear that at least in the absence of contrary legislation, courts under their inherent powers have developed a wide range of tools to promote efficiency in their courtrooms and to achieve justice in their results. E.g., Link, 370 U.S. at 630-31, 82 S.Ct. at 1388-89 (where the Supreme Court stated that the authority to dismiss a case is an inherent "control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases"); see also Moulton v. Commissioner of Internal Revenue, 733 F.2d 734, 735 (10th Cir.1984); Barnd v. City of Tacoma, 664 F.2d 1339, 1342 (9th Cir.1982); Penthouse International Ltd. v. Playboy Enterprises, Inc., 663 F.2d 371, 386 (2d Cir.1981).
 
 B.
 
 26
 Nearly a quarter century ago, and more than fifteen years prior to the Supreme Court's decision in Roadway, this Court sitting in banc held that a district court lacked inherent authority to impose a "fine" on an attorney who had failed to file a pretrial memorandum in a timely fashion. Gamble v. Pope & Talbot, Inc., 307 F.2d 729 (3d Cir.), cert. denied, 371 U.S. 888, 83 S.Ct. 187, 9 L.Ed.2d 123 (1962). The plurality of the Court believed that the effect of the fine, whatever "it be called ... was to punish defendant's attorney for contempt in failing to file the defense pretrial memorandum within time." Id. at 731. The district court in Gamble did not, however, designate the lawyer's act as contempt nor did it invoke the formal contempt proceeding. On review, this Court noted that there was nothing in the Federal Rules of Civil Procedure which explicitly authorized the sanction that had been imposed. Id. While the plurality conceded that district courts have substantial local rulemaking power, it determined that such a "basic disciplinary innovation" as the sanction in question required a national "uniform approach." Id. at 732. The plurality believed that only a statute or Federal Rule could accomplish this. Significantly, while stating that no inherent authority for the fine existed, neither the plurality opinion nor the concurring statement of Judge Hastie discussed the doctrine of inherent powers, and neither opinion cited any case involving inherent power.
 
 
 27
 Judge Goodrich, dissenting, asserted that a judge "undoubtedly has inherent power to impose sanctions for the disciplining of lawyers who, in matters not amounting to contempt, do not obey rules." Id. at 737 (Goodrich, J., dissenting). In a separate dissent Chief Judge Biggs disputed the majority's perception that the fine carried any criminal connotation. He emphasized that unlike many of the penalties that courts impose for an attorney's failure to perform his or her duty, the monetary sanction did not punish clients for the shortcomings of their counsel. Id. at 734.[10]
 
 
 28
 The decision in Gamble was promptly and roundly criticized. E.g., Note, Power of Federal Courts, 38 Notre Dame Law. 158; Comment, Dismissal for Failure to Attend a Pretrial Conference and the Use of Sanctions at Preparatory Stages of Litigation, 72 Yale L.J. 819 (1963). And the case has continued to come under attack. See, e.g., Renfrew, Discovery Sanctions, A Judicial Perspective, 67 Calif.L.Rev. 264, 270 (1979); Comment, Sanctions Imposed by Courts on Attorneys Who Abuse the Judicial Process, 44 U.Chi.L.Rev. 619, 635 (1977). Commentators have highlighted the curious and contradictory result created by the juxtaposition of Link, decided in 1962, and Gamble, decided one year later. Under Link, courts may invoke their inherent power to dismiss a plaintiff's entire case when a lawyer has failed without adequate excuse to appear at a scheduled pretrial conference, Link, 370 U.S. at 628-29, 82 S.Ct. at 1387-88, but under Gamble courts may not sanction financially a blameworthy attorney who filed a pretrial memorandum ten months late, Gamble, 307 F.2d at 730. See, e.g., Comment, Financial Penalties, 26 UCLA L.Rev. at 877.
 
 
 29
 Recently a number of courts have rejected the result and reasoning of Gamble as unduly narrow. See, e.g., Miranda v. Southern Pacific Transp. Co., 710 F.2d 516, 520 (9th Cir.1983) ("For the reasons stated by Judge Biggs, we decline to follow Gamble."); Martinez v. Thrifty Drug & Discount Co., 593 F.2d 992, 993 (10th Cir.1979) (explicitly rejecting Gamble ); In re Sutter, 543 F.2d 1030, 1037 (2d Cir.1976) ("We ... decline to follow the Third Circuit."); see also Richman v. General Motors Corp., 437 F.2d 196, 200 (1st Cir.1971). A major factor in the decisions that have refused to follow Gamble has been the startling increase in the number and complexity of cases filed in the federal courts. The dramatic rise in litigation in the last decade has led trial judges to conclude that indulgent toleration of lawyers' misconduct is simply a luxury the federal court system no longer can afford. See Renfrew, supra, 67 Calif.L.Rev. at 275-76. Chief Justice Burger has recently observed that "a small handful [of lawyers] must not be permitted to abuse the system and preempt its time and machinery for purposes not intended, thus delaying and denying" access to courts to others in need of the courts' limited resources. Burger, Abuses of Discovery, Trial (Sept.1984). For example, the Second Circuit in Sutter upheld the imposition of juror costs based in part upon "intensified concerns" over "the increasing backlog of calendars." 543 F.2d at 1037. The Martinez court concluded that a sanction based on the cost of impanelling a jury had the "object and purpose of administering the court in an efficient manner." 593 F.2d at 994.
 
 C.
 
 30
 With the foregoing discussion of inherent powers and the evolution of practice regarding attorney sanctions as background, we turn to the challenged order at issue here. Appellants, relying on the continuing vitality of the reasoning in Gamble, urge that a sanction in the form of juror costs improperly and "informally inflict[ed] a criminal" punishment, like contempt, without resort to the contempt statute. Gamble, 307 F.2d at 733. To a considerable extent, Judge Sloviter's dissent also rests on this view.
 
 
 31
 In Gamble this Court essentially was concerned with the imposition of a fine unrelated to any actual consequence of counsel's conduct and that knew no bounds other than each individual judge's notion of an appropriate penalty warranted by a counsel's misdeeds. The present case is significantly different in that the district court tied its sanction to specific costs that bore a direct relationship to the alleged misconduct and thus offered a nexus and a limit.
 
 
 32
 Moreover, and perhaps most significantly, the Gamble court's reasoning runs counter to the Supreme Court's observations that a court's broad power to discipline attorneys as officers of the court for misconduct not properly categorized as contempt is substantially different from the contempt power. The Supreme Court has noted, for example, that the " 'power to disbar an attorney proceeds upon very different grounds' from those which support a court's power to punish for contempt." Cammer v. United States, 350 U.S. at 408 n. 7, 76 S.Ct. at 460 n. 7 (quoting Ex parte Robinson, 86 U.S. (19 Wall.) 505, 512, 22 L.Ed. 205 (1873)). Similarly, we agree with the Ninth Circuit that a reasonable "monetary sanction for failure to carry out [an attorney's] special responsibility [to the court] ... differs from the more severe infraction of contempt for which attorneys and members of the general public can become liable." Miranda, 710 F.2d at 521. The former is based simply on an unjustified failure to discharge an administrative responsibility as an officer of the court.
 
 
 33
 Relying in part on the Supreme Court's holding in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), that the President was without inherent power to order the Secretary of Commerce to take possession of and actually operate most of the nation's steel mills, one dissenting opinion argues that the district court's assertion of authority to impose a sanction of $390 upon an attorney who has abused the judicial process somehow violates the doctrine of separation of powers. The Supreme Court has consistently recognized the federal court's powers--notwithstanding the absence of Congressional action--to sanction errant attorneys financially both for contempt and for conduct not rising to the level of contempt. See, e.g., Roadway, 447 U.S. at 765, 100 S.Ct. at 2463. Thus the dissent is relegated to arguing that the specific type of monetary sanction imposed here, one "unrelated to the other parties' costs," is akin to a criminal "fine" and "a fine can be imposed only to punish conduct that has been prohibited by the legislature." No authority has been offered for the proposition that financial sanctions by a federal court for abuse of the judicial process by an attorney before that court must be directly related to the other litigants' costs. Instead the dissent employs as an analog cases forbidding federal courts from creating federal common law crimes or from expanding the reach of criminal statutes. We agree with the Ninth Circuit that the imposition of juror costs when an attorney abuses the judicial process in a manner that forces the unnecessary calling of a jury does not carry any criminal connotation. Miranda, 710 F.2d at 521; see Comment, Financial Penalties, 26 UCLA L.Rev. at 890; see also Dowling, supra, 21 A.B.A.J. at 637.
 
 
 34
 The impact of the contrary position, moreover, would apparently be to invalidate many of the financial sanctions imposed by this Court and other courts of appeals, cf., e.g., Miranda, 710 F.2d at 521, for myriad violations of court rules, deadlines, or orders, such as the late-filing of a brief, or for conduct unbecoming a member of the bar. Although these financial penalties, payable to the government, are often based to some extent on Fed.R.App.P. 46(c), neither that Rule nor any Congressional enactment explicitly provides for such financial sanctions, nor expressly prohibits the conduct sanctioned by the court--a step Judge Sloviter's dissent argues is constitutionally mandated.
 
 
 35
 More fundamentally, we agree with those courts that have found the result in Gamble to be excessively restrictive in practice. While the judicious use of sanctions is a practical necessity in the management of caseloads, Comment, Financial Penalties, 26 UCLA L.Rev. at 875, the more traditional penalties based on a court's inherent powers, and the specialized sanctions of the Federal Rules of Civil Procedure, are at times inadequate to regulate the wide range of attorney misconduct. Cf. Miller, The Adversary System: Dinosaur or Phoenix, 69 Minn.L.Rev. 1, 25 (1984). For example, the court's power to dismiss a plaintiff's action because of the misdeeds of counsel, while unquestioned in principle after Link, must be exercised with great restraint because it subverts the sound public policy of deciding cases on their merits and punishes the client for the counsel's conduct. E.g., Hritz v. Woma Corp., 732 F.2d 1178, 1181 (3d Cir.1984) ("we have repeatedly stated our preference that cases be disposed of on the merits whenever practicable"). The imposition of a modest monetary sanction on counsel is obviously considerably less severe than outright dismissal of an action, and is perhaps more appropriate in that the penalty is directed at the lawyer responsible for the infraction, rather than the litigant who may be completely innocent. Id.; see also Miranda, 710 F.2d at 521; Gamble, 307 F.2d at 734 (Biggs, C.J., dissenting); Miller, supra, 69 Minn.L.Rev. at 25, 27. The dissent, by denying the district courts this flexibility, would seem only to magnify the risk of a harsh and potentially inequitable response to attorney misconduct. The contempt sanction is similarly viewed as a drastic step. Contempt, concerned theoretically with the order, dignity, and decorum of a court, or with willful obstruction of justice, see Comment, Financial Penalties, 26 UCLA L.Rev. at 879, may be inappropriate in many situations of attorney misdeeds. Miranda, 710 F.2d at 521; Comment, Dismissal for Disobedience, 34 U.Chi.L.Rev. at 937; see also Sanctions Imposable, supra note 5, at 180-81 n. 470.
 
 
 36
 Judge Sloviter questions any reliance on "usefulness" as a factor relevant to the analysis, but we cannot overlook the language of the Supreme Court in Link, 370 U.S. at 630-31, 82 S.Ct. at 1388-89 stating that the "inherent power" to sanction an attorney was "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." If a court's inherent powers include the ability to do whatever is reasonably necessary to deter abuse of the judicial process, cf. National Hockey League, 427 U.S. at 643, 96 S.Ct. at 2781, courts must be able to impose reasonable sanctions for conduct by lawyers that falls short of contempt of court. Sutter, 543 F.2d at 1037; Renfrew, supra, 67 Calif.L.Rev. at 270; Comment, Dismissal for Disobedience, 34 U.Chi.L.Rev. at 937. A court's inherent power to manage its caseload, control its docket, and regulate the conduct of attorneys before it, provides authority to fashion tools that aid the court in getting on with the business of deciding cases. A recent study of sanctions in federal courts concluded that "the imposition of financial penalties is the only sanction both mild enough and flexible enough to use in day-to-day enforcement of orderly and expeditious litigation." Sanctions Imposable, supra note 5, at 86.
 
 
 37
 Referring to language in Link that the inherent power to dismiss a case was of "ancient origin," Judge Sloviter suggests that a lack of similar history fatally undermines the sanction used in the present case. It is true that historically most monetary sanctions imposed directly on attorneys, outside of the contempt context, have been related in some way to the expenses unnecessarily incurred by the opposing party. Cf. United States v. Blodgett, 709 F.2d at 611. Nevertheless we do not believe that a long-standing tradition need undergird every particular sanction imposed pursuant to the district court's inherent powers. See Note, Power of Federal Courts, 38 Notre Dame Law. at 165 ("courts have exercised vastly similar powers ... for centuries," and the failure of many "courts to use this particular penalty does not prove the absence of the power to levy it"). The historical discussion in Link constituted a description; it did not establish a prerequisite to the employment of a sanction. Perhaps more telling is Roadway, in which the Supreme Court held that, despite the absence of Congressional authorization, in a proper case attorneys' fees may be assessed directly against a lawyer for abuse of the judicial process. The decision also reaffirmed a court's power to dismiss a case when a plaintiff fails to pursue the litigation diligently, and observed that the power of a court over the members of its bar must be at least as great as its authority over litigants. Roadway, 447 U.S. at 766, 100 S.Ct. at 2464. In upholding the taxing of counsel fees directly against an attorney, the Court was not dissuaded by the fact that this particular sanction did not have a long legal ancestry; in fact it ran counter to the "American rule" that each side pay its own fees. Rather, the Supreme Court emphasized the well acknowledged inherent power of a court to levy a reasonable sanction in response to abusive litigation practices. Id. at 765, 100 S.Ct. at 2463. Significantly, the Supreme Court cited Chief Judge Biggs' dissent in Gamble with approval in its discussion of the inherent power of a court to impose reasonable sanctions upon those admitted to its bar. Id. at 766 n. 12, 100 S.Ct. at 2464 n. 12 (citing Gamble, 307 F.2d at 735-36 (Biggs, C.J., dissenting)).
 
 
 38
 Roadway also would appear to refute the argument that the mere existence of the cost statutes, Secs. 1920 & 1927, prevents reliance by courts on their inherent powers to support the imposition of a reasonable monetary sanction closely tied to the attorney's misconduct. Although there may be some inherent powers that a court may not exercise in the face of contrary legislation, e.g., Alyeska, 421 U.S. at 259, 95 S.Ct. at 1622, it would be an unwarranted extension of these precedents to argue that through Secs. 1920 and 1927 Congress has pre-empted entirely the field of monetary sanctions against errant attorneys. In Roadway, the Court found that nothing in the statutes or their history suggests that Congress intended to preclude the use of a monetary sanction not expressly provided for in Sec. 1920 and Sec. 1927. Indeed, the Court acknowledged that although assessment of attorney's fees directly on an errant attorney was not a cost enumerated by Congress, the sanction was fully within the court's inherent powers. Cf. Link, 370 U.S. 626, 82 S.Ct. at 1386 (existence of Federal Rule permitting district court to dismiss case upon motion of party did not supersede court's inherent power to dismiss sua sponte ); Note, Power of Federal Courts, 38 Notre Dame Law. at 169.
 
 
 39
 The present appeal does not raise one of the precise issues proffered in Gamble, i.e., the propriety of a monetary sanction wholly unrelated to any costs incurred by a litigant, the court, or the government as a result of attorney misconduct. We do not resolve here the narrow question of what degree of nexus between sanction and misconduct is necessary. However, our fresh evaluation of the importance and necessity of some kind of sanction as one of the reasonable and flexible instruments for curbing abuse of the judicial process suggests that Gamble should no longer control this conceptual area. In light of the above described development of the law of sanctions, the persuasive reasoning of commentators, the combined wisdom of several other courts of appeals, and the fact that the Supreme Court significantly undercut Gamble in Roadway, we now most respectfully overrule Gamble.
 
 
 40
 We do not imply, in upholding the power of the district court to impose a sanction on an attorney in a proper case, that the imposition of a sanction was proper in the present case, see infra Part VI, nor do we express any view on what forms of attorney misconduct would justify the imposition of the sanction. Certainly, however, the district court must exercise discretion and sound judgment in dealing with the myriad methods with which lawyers may abuse the judicial process. Nor is anything in this opinion meant to suggest that settlement on the eve of trial is in and of itself improper. Frequently a settlement may be in the best interest of not only clients and their attorneys, but of the judicial system and society as a whole. The suggestion in the present proceeding, however, is that because of misconduct by an attorney a settlement took place at an unjustifiably late date thereby occasioning the waste of scarce judicial resources and the unnecessary expense of calling a jury.
 
 V
 
 41
 The district court in the case at hand did not appear to base its sanction upon any local rule. The Supreme Court has stated, however, that a court's inherent authority over members of its bar is not limited to those specific facets of conduct covered by a local rule. In upholding a court's inherent power to dismiss a lawsuit, the Supreme Court in Link held:Petitioner's contention that the District Court could not act in the conceded absence of any local rule covering the situation here is obviously unsound. Federal Rule of Civil Procedure 83 expressly provides that "in all cases not provided for by rule, the district courts may regulate their practice in any manner not inconsistent with these rules."
 
 
 42
 Link, 370 U.S. at 633 n. 8, 82 S.Ct. at 1390 n. 8, see also Sutter, 543 F.2d at 1037. While we believe that the district court in imposing the sanction at issue here need not have relied on a local rule, we nevertheless suggest that if the district courts believe that there are occasions in which the imposition of such a sanction would be just, wise, and efficacious, a local rule on the imposition of such a sanction might well be salutary.
 
 
 43
 The rulemaking power of the district courts is now codified at 28 U.S.C. Sec. 2071 (1982), which provides that the district courts may make rules prescribing the conduct of court business. The only statutory requirement is that the local rules promulgated be consistent with acts of Congress and the rules prescribed by the Supreme Court. The Federal Rules of Civil Procedure permit the district courts to make and amend rules governing their practice not at variance with the other Federal Rules. We agree with the Second, Ninth, and Tenth Circuits that the district courts have the power, absent a statute or rule promulgated by the Supreme Court to the contrary, to make local rules that impose reasonable sanctions where an attorney conducts himself in a manner unbecoming a member of the bar, fails to comply with any rule of court, including local rules, or takes actions in bad faith. See Miranda, 710 F.2d at 521-22; Martinez, 593 F.2d at 994; Sutter, 543 F.2d at 1037-38; see also Sanctions Imposable, supra note 5, at 265; Renfrew, supra, 67 Calif.L.Rev. at 270; Comment, Sanctions Imposed by Courts, 44 U.Chi.L.Rev. at 635; accord Fed.R.App.P. 46(b) (conduct unbecoming a member of the bar).
 
 
 44
 The Gamble plurality, in addition to finding the sanction imposed there to be unauthorized by inherent power, thought the "fine" assessed to be a "basic disciplinary innovation" and thus beyond the scope of the "local rulemaking power." 307 F.2d at 732. It is not clear, however, that the use of a reasonable, albeit nontraditional, sanction closely tied to the misconduct of the attorney fairly can be characterized as a "basic innovation." This is true especially given the universally recognized need to deter abuse of the judicial process. The Gamble court apparently was relying on language in Miner v. Atlass, 363 U.S. 641, 80 S.Ct. 1300, 4 L.Ed.2d 1462 (1960), which held that district courts could not introduce discovery into admiralty proceedings pursuant to local rule. Discovery was termed "one of the most significant innovations" of the Federal Rules of Civil Procedure, id. at 649, 80 S.Ct. at 1305, and thus a local rule governing discovery in the admiralty context was regarded at that time as improper. The Supreme Court suggested, however, that a local rule might be more appropriate in situations involving "the necessary choice of a rule to deal with a problem which must have an answer, but need not have any particular one." Id.
 
 
 45
 More recently the Supreme Court has clarified the role of local rules in achieving procedural change. In Colgrove v. Battin, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), it upheld the validity of a local rule providing for a jury of six in a civil trial. The Court declared that the "requirement of a six-member jury is not a 'basic procedural innovation.' " The Court went on to define the " 'basic procedural innovations' to which Miner referred" as "those aspects of the litigatory process which bear upon the ultimate outcome of the litigation." Id. at 164 n. 23, 93 S.Ct. at 2456 n. 23. A reasonable monetary sanction on an errant attorney is not a procedural innovation beyond the reach of a local rule since it is not outcome-determinative in the sense suggested by the Supreme Court.
 
 
 46
 Regarding the wisdom of a local rule on monetary sanctions, Gamble suggested that a national "uniform approach" was required. However, given that the district courts vary tremendously in size, volume of cases, calendar congestion, and types of cases, and that litigation tactics of attorneys may differ across the country, it is not readily apparent that a national rule is either required or desirable. Cf. Comment, Financial Penalties, 26 UCLA L.Rev. at 875. In the context of judicial disciplinary rules a recent commentator has noted that in "some instances the potential benefits of continuing experimentation are so obvious, and the costs arising from disuniformity so speculative, that requiring a uniform rule would be premature." Burbank, Procedural Rulemaking Under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, 131 U.Pa.L.Rev. 283, 326 (1982). Others have observed that desirable differences in local rules stem in part from varying "local expectations and practice." Flanders, Local Rules in Federal District Courts: Usurpation, Legislation, or Information, 14 Loyola L.A.L.Rev. 213, 264 (1981).
 
 
 47
 Several courts have promulgated rules that provide for an assessment of juror and related costs, when a settlement occurs improperly shortly before trial.[11] "Such local rules occupy a vital role in the district courts' efforts to manage themselves and their dockets," Flanders, supra, 14 Loyola L.A.L.Rev. at 263, and are essential tools in implementing court policy. Id. at 218. The local rule device fulfills important informational purposes, placing the bar on notice of a court's policies. Id. at 263. Similarly, a local rule may well be the most effective means of ensuring that all members of the bar are aware that a particular practice is deemed improper, and thus subject to a sanction. Local rules may also alert rulemakers to the need for changes in national rules and supply an empirical basis for making such changes. Furthermore, a local rule may be a powerful implement for rationalizing diverse court practices and imposing uniformity within a given district. Id. at 268, 269.
 
 VI
 
 48
 Finally, appellants assert that the imposition of a monetary sanction by the district court without affording the attorney prior notice and an opportunity to be heard violates due process. We agree.
 
 
 49
 In the absence of extraordinary circumstances, procedural due process requires notice and an opportunity to be heard before any governmental deprivation of a property interest. Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). The form which those procedural protections must take is determined by an evaluation of all the circumstances and an accommodation of competing interests. See Goss v. Lopez, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975); Renfrew, supra, 67 Calif.L.Rev. at 281. The individual's right to fairness and accuracy must be respected, as must the court's need to act quickly and decisively.
 
 
 50
 In considering the imposition of a penalty upon attorneys, we note that the Court has cautioned that like "other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." Roadway, 447 U.S. at 767, 100 S.Ct. at 2464. Similarly, a court may not disbar an attorney without notice and a hearing. Ex parte Bradley, 74 U.S. (7 Wall.) 364, 372-74, 19 L.Ed. 214 (1869). Courts of appeals may not impose disciplinary sanctions on attorneys until "after reasonable notice and an opportunity to show cause to the contrary, and after hearing, if requested." Fed.R.App.Pro. 46(c). Although in Link the Supreme Court suggested that not every order entered without a preliminary adversary hearing offends due process. Link, 370 U.S. at 632, 82 S.Ct. at 1389, we believe that as a general practice a monetary detriment should not be imposed by a court without prior notice and some occasion to respond.
 
 
 51
 These procedural safeguards will ensure that the attorney has an adequate opportunity to explain the conduct deemed deficient. For example, in the present case, the attorney by affidavits disputes the factual predicate upon which the order was based. Furthermore, such procedures will afford the judge adequate time to evaluate the propriety of the particular sanction in light of the offending attorney's explanation as well as to consider alternatives. See Hritz v. Woma Corp., 732 F.2d at 1182; Edgar v. Slaughter, 548 F.2d 770, 773 (8th Cir.1977); see also Miranda, 710 F.2d at 522-23. Moreover, by providing a record, a hearing will facilitate appellate review. Miranda, 710 F.2d at 522-23; Renfrew, supra, 67 Calif.L.Rev. at 281. In some cases, it may be that the record developed at the time of the alleged misconduct will, itself, satisfy this need as long as the attorney has been afforded an opportunity to adduce the relevant facts. Upon imposing such a sanction it would seem appropriate for the district court to make adequate written findings. Renfrew, supra, 67 Calif.L.Rev. at 281; cf. Wilson v. Volkswagon of America, Inc., 561 F.2d 494, 516 (4th Cir.1977), cert. denied, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978) (appellate review difficult without adequate findings).[12]
 
 
 52
 A final point worth noting, although not raised in the briefs, is that the due process calculus may also be affected by the "knowledge which the circumstances show [the offending] party may be taken to have of the consequences of his own conduct." Link, 370 U.S. at 632, 82 S.Ct. at 1390. Thus, fundamental fairness may require some measure of prior notice to an attorney that the conduct that he or she contemplates undertaking is subject to discipline or sanction by a court. Consequently the absence, for example, of a statute, Federal Rule, ethical canon, local rule or custom, court order, or, perhaps most pertinent to the case at hand, court admonition, proscribing the act for which a sanction is imposed in a given case may raise questions as to the sanction's validity in a particular case.
 
 
 53
 As noted in Part V of this opinion there does not appear to be a local rule covering the conduct of the attorney in question. Nor is it apparent that any analogous form of actual or constructive notice was given to the attorney whose settlement conduct was deemed sanctionable by the district court, although there is no way of ascertaining that fact from the record before us. Therefore, a remand of the matter for consideration of this as well as the previously discussed due process issues is required.
 
 VII
 
 54
 The order of the district court will be vacated and the case remanded for action consistent with this opinion.
 
 APPENDIX
 
 55
 The following is the text of the order challenged in this appeal:
 
 ORDER
 
 56
 The above captioned case was set for trial on Monday, May 23, 1983. Plaintiff's attorney made repeated attempts to contact defendant's attorney in regards to settlement possibilities during the week of May 16, 1983. Receiving no response, plaintiff prepared for trial and appeared on May 23rd, ready to present his case.
 
 
 57
 At this point, defendant's attorney made a proposal of settlement which was accepted by plaintiff. The defendant's attorney was scheduled for trial in state court the same day. The settlement avoided a possibly unfortunate conflict.
 
 
 58
 The settlement on the eve of trial was not justified. Defendant's attorney was given adequate notice by plaintiff's counsel and by Court personnel to attempt to reach an agreement.
 
 
 59
 IT IS HEREBY ORDERED that William Tighe, Esquire, is directed to pay to the Clerk of Court for the Western District of Pennsylvania the sum of $390.00, computed as follows: $30.00 (per diem fee for jurors) times 13, the minimum number of jurors necessary to select a jury of seven persons, one being an alternate, to be selected by lot. Said amount is payable by September 2, 1983.
 
 
 60
 SEITZ, Circuit Judge, dissenting.
 
 
 61
 I read the majority opinion to hold that based on their inherent power and perhaps also on rights bestowed by the last sentence of Fed.R.Civ.P. 83,[1] district courts have the power, subject to certain equities, to assess jury costs against counsel when counsel settle a case on the eve of a jury trial. Although some of my colleagues attack this holding, my disagreement with the majority does not rest on a dispute as to the existence of the power of the district courts to act with respect to such subject matter. Rather, I am convinced that given the subject matter involved, the inherent power or the last sentence of Rule 83 cannot be employed by the district courts on an ad hoc basis.
 
 
 62
 In approaching the resolution of the present issue, it should be emphasized, as Justice Powell noted in Roadway Express, Inc. v. Piper, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980): "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." That caveat is particularly applicable here because the practice of last minute settlements which triggers these proceedings has not been thought by members of the bar to be reprehensible or otherwise impermissible. On the contrary, I take judicial notice that settling on the eve of trial has frequently been a "way of life" in the practice of law in this country for innumerable years. Indeed, such settlements were often thought to be in a client's best interests.
 
 
 63
 Given the long held understanding of the bar in this area, I believe fundamental fairness dictates that before an attorney may be subjected to the sanctions here implicated, he or she must be on notice, either actual or constructive, that such conduct may result in sanctions. This notice may take many forms. Certainly a local rule or some equivalent would be sufficient to put the practicing bar on notice that the particular practice may result in an assessment of jury fees. The record is barren of any such prior notice here.
 
 
 64
 This court has long recognized its inherent supervisory power to regulate significant procedural matters in the district courts. See Johnson v. Trueblood, 629 F.2d 302 (3d Cir.1980), cert. denied, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 209 (1981) (invoking supervisory power to require notice and a hearing before district court may revoke attorney's pro hac vice status). Thus, due process implications apart, I believe that we should decide under our supervisory power that fairness dictates that if district courts desire under their inherent or other power to impose sanctions in connection with "late" settlement of scheduled jury trials, they must provide some form of advance notice to the bar by rule, or otherwise, that sanctions may attach for an eve of trial settlement in jury trials.[2] See In re United Corp., 283 F.2d 593 (3d Cir.1960) (appellate tribunal may reverse action of district court made pursuant to last sentence of Rule 83 if action is arbitrary or fundamentally unfair).
 
 
 65
 I do not wish my position here to be construed as any disagreement with the worthy objectives of saving the time of judicial personnel and preventing expense to the government arising from the payment of juror fees unnecessarily incurred. My position is based on principles of basic fairness. Notice of changes in the rules of the game should be conveyed to the players before the game is played.
 
 
 66
 I regard as a fundamental flaw the absence of prior notice that a sanction could flow from the particular conduct here involved. I would therefore not remand this case for a hearing and decision based on an after-the-fact notice. Rather, I would reverse the order of the district court.
 
 
 67
 SLOVITER, Circuit Judge, with whom Judges GIBBONS and HIGGINBOTHAM join, dissenting.
 
 
 68
 The majority's holding that a district court has inherent power to impose fines on attorneys who are not in contempt of court for conduct not prohibited by statute or Federal Rule is based on the majority's belief that it would be "highly useful" for a court to have such power. I dissent from the majority's holding because it arrogates unto the federal judiciary Congress' power to establish penalties and define assessable costs, and because it encroaches upon the limits to the contempt power established by Congress and the courts. The majority's rationale for such unprecedented judicial activism expands the inherent power of federal courts beyond any realistic limitation or control, and thereby upsets the finely tuned balance of powers among the three branches of our government. Regrettably, the posture of this case makes it unlikely that this fundamental issue will be presented for review to the Supreme Court.
 
 I.
 
 69
 Before being confronted with the majority's holding to the contrary, I would have thought it to be indisputable that it is Congress, as the legislative branch, and not the judiciary that has the power to establish crimes and penalties and define costs. The separation of powers among the three branches of our government is the keystone of our constitutional framework. As the Supreme Court recently stated in INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983):
 
 
 70
 The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.
 
 
 71
 (emphasis added). Patently, the separation of powers doctrine is violated when one branch of government assumes a function that more properly is entrusted to another. See id. at 2790 (Powell, J., concurring); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952).
 
 
 72
 The first sentence of the Constitution expressly vests the legislative power in Congress, Art. I, Sec. 1. Congress through its Article I, Section 8 power to enact those laws that are "necessary and proper" has the exclusive power to define offenses and to establish penalties. Early in our constitutional history, the Supreme Court concluded that federal courts, unlike many state courts, lacked jurisdiction and authority to establish federal common law crimes. In United States v. Hudson and Goodwin, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812), the Court stated:
 
 
 73
 The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the court that shall have jurisdiction of the offence.
 
 
 74
 Certain implied powers must necessarily result to our courts of justice, from the nature of their institution. But jurisdiction of crimes against the state is not among those powers.
 
 
 75
 Only in the matter of contempt, which is not considered an offense within the ordinary meaning of that term, Myers v. United States, 264 U.S. 95, 103, 44 S.Ct. 272, 273, 68 L.Ed. 577 (1924), has there been any historical divergence from the principle that offenses against the United States are to be established by Congress. Ex parte Grossman, 267 U.S. 87, 113-18, 45 S.Ct. 332, 334-36, 69 L.Ed. 527 (1925).
 
 
 76
 The principle of Hudson and Goodwin that Congress has the sole power to establish and define penalties and offenses has been applied in various situations. For example, even when the legislative intent to prohibit certain conduct is clear, if Congress by oversight fails to prescribe a penalty with specificity, Congress, not the courts, must make the necessary revision. United States v. Evans, 333 U.S. 483, 486, 68 S.Ct. 634, 636, 92 L.Ed. 823 (1948). Moreover, courts may not expand the scope of the offenses that Congress has defined to include conduct inadvertently omitted in the statute, no matter how salutary the purpose. Viereck v. United States, 318 U.S. 236, 243-45, 63 S.Ct. 561, 564-65, 87 L.Ed. 734 (1943). As the Court stated, "[T]he courts are without authority to repress evil save as the law has proscribed it and then only according to law." Id. at 245, 63 S.Ct. at 565.
 
 
 77
 Although the majority euphemistically refers to the assessment in this case as a sanction rather than a penalty, the majority's characterization is not determinative. The majority's slick definitional effort to dissociate the penalty imposed from "criminal connotation" is not advanced by mere citation to another court of appeals that has done likewise. A monetary sanction unrelated to the other parties' costs is a fine, and a fine can be imposed only to punish conduct that has been prohibited by the legislature. In Republic Steel Corp. v. NLRB, 311 U.S. 7, 12-13, 61 S.Ct. 77, 79-80, 85 L.Ed. 6 (1940), the Court held that an assessment by the NLRB styled as backpay but payable to the government was invalid as an unauthorized punishment. The court reasoned that if the assessment was to redress an injury to the public, it was in the nature of a penalty. Id. at 10, 61 S.Ct. at 78. Because Congress had not established such a retributive scheme, the punishment was beyond the Board's authority. The Court rejected the Board's argument that its power to make such assessments should be upheld as furthering the policy of the National Labor Relations Act:
 
 
 78
 [I]t is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end.
 
 
 79
 Id. at 12, 61 S.Ct. at 79.
 
 
 80
 The courts cannot legitimately circumvent the constitutional allocation of power by asserting their own unlimited inherent power. An attempt by the President to enlarge his constitutional power by claiming inherent power was emphatically rejected by the Supreme Court. In Youngstown Sheet & Tube Co. v. Sawyer, the Court held that the President had no inherent power to issue an Executive Order directing the Secretary of Commerce to seize and operate most of the steel mills to avert a nation-wide strike of steel workers that the President believed would jeopardize national defense. 343 U.S. at 582, 584, 72 S.Ct. at 864, 865. The reasoning of several of the Justices in support of that holding is particularly apt here. Justice Black, writing for the Court, concluded that a decision to authorize the taking of property was for Congress to make. Id. at 588, 72 S.Ct. at 867. Because Congress had not authorized the executive to make the seizures, the President was without power. Id. at 585, 72 S.Ct. at 865. Justice Black stated, "Congress has not ... lost its exclusive constitutional authority to make laws necessary and proper to carry out the powers vested by the Constitution...." Id. at 588-89, 72 S.Ct. at 867. He further stated, "The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times." Id. at 589, 72 S.Ct. at 867.
 
 
 81
 Justice Frankfurter, concurring, noted that Congress, in the context of legislative deliberations on the LMRA, had considered a proposal that would have given the President the power to seize property in similar circumstances. Because Congress had rejected that proposal, Justice Frankfurter reasoned that Congress retained such power for itself. Id. at 599-602, 72 S.Ct. at 891-893. As he stated, "The need for new legislation does not enact it. Nor does it repeal or amend existing law." Id. at 604, 72 S.Ct. at 894. Justice Jackson, also in concurrence, wrote that, "[t]he appeal ... that we declare the existence of inherent powers ex necessitate to meet an emergency asks us to do what many think would be wise, although it is something the forefathers omitted." Id. at 649-50, 72 S.Ct. at 877.
 
 
 82
 The danger of intrusion by one branch of the government on the powers of another is no less when it is the judiciary that is the usurper. As James Madison recognized:
 
 
 83
 Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor.
 
 
 84
 The Federalist No. 47, at 338 (B. Wright ed. 1961) (quoting Montesquieu).
 
 
 85
 There is no statutory authority that would authorize a court to penalize an attorney's late settlement of a case or to assess against an attorney the cost of impanelling a jury. Thus in penalizing such attorney conduct and in imposing the forum costs as a penalty, the district court overstepped the boundary of judicial power.
 
 
 86
 Under 28 U.S.C. Sec. 1927 (1982) the court may impose on counsel the "excess costs, expenses, and attorneys' fees reasonably incurred because of" counsel's conduct that "unreasonably" and "vexatiously" multiplies proceedings. Significantly, the conduct proscribed is "multipl[ying] proceedings," not settling them. Further, the only "costs" that can be assessed under that section are those of the parties to the litigation, not the juror costs to the government. As explained in the Conference Report to the 1980 amendment broadening the range of "costs" under this statute to include "attorneys' fees reasonably incurred because of such [dilatory] conduct," the errant attorney may be required to satisfy the full range of excess costs when his or her "conduct causes the other parties to incur expenses and fees that otherwise would not have incurred" [sic]. H.Conf.Rep. No. 1234, 96th Cong., 2d Sess., reprinted in 1980 U.S.Code Cong. & Ad.News, 2716, 2781, 2782 (emphasis added).
 
 
 87
 The general cost provision contained in 28 U.S.C. Sec. 1920 (1982) does not assess jurors' fees as costs that the parties must pay. In Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court construed 28 U.S.C. Sec. 1920 as defining and limiting recoverable costs and fees. In concluding that the court of appeals erred when it broke with traditional limitations and allowed attorneys' fees to plaintiffs who acted as "private Attorney Generals," the Court stated:
 
 
 88
 It appears to us that the rule suggested here and adopted by the Court of Appeals would make major inroads on a policy matter that Congress has reserved for itself ... [Federal] courts are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation....
 
 
 89
 Id. at 269, 95 S.Ct. at 1627 (emphasis added). The Court further stated that the "American rule" against the allowance of attorneys' fees was "deeply rooted in our history and in congressional policy" and therefore "it is not for us to invade the legislature's province by redistributing litigation costs in the manner suggested by respondents and followed by the Court of Appeals." Id. at 271, 95 S.Ct. at 1628.
 
 
 90
 Whether imposed solely as compensation for the winning party, or for both compensatory and punitive purposes, costs have traditionally and statutorily been limited to those borne by the parties, such as witness fees, printing, or, on occasion, attorneys' fees. Only those expenses of the forum that are by statute borne by the parties may be assessed as a sanction or imposed upon the loser. Since no statute calls upon a prevailing party to pay the per diem costs of jurors, this expense of the forum is no more recoverable than is the aliquot share of the judge's salary or of the heating and electricity of the courthouse building. The majority's holding in sustaining imposition of "costs" borne by the forum itself intrudes on Congress' role to establish the parameters for the imposition of costs. See United States v. Ross, 535 F.2d 346, 350-51 (6th Cir.1976); Gleckman v. United States, 80 F.2d 394, 403 (8th Cir.1935), cert. denied, 297 U.S. 709, 56 S.Ct. 501, 80 L.Ed. 996 (1936); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice, p 54.77 at 1751 (2d ed. 1983).
 
 
 91
 The majority relies primarily on the Supreme Court's decisions in Link v. Wabash Railroad, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962), and Roadway Express, Inc. v. Piper, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), for its expansive view of the courts' inherent powers. In Link the sanction at issue was the dismissal of an action for want of prosecution. Not only was that sanction expressly recognized in Federal Rule of Civil Procedure 41(b), but a court's power to dismiss sua sponte was noted to be "of ancient origin, having its roots in judgments of nonsuit and non prosequitur entered at common law." Id. 370 U.S. at 630, 82 S.Ct. at 1388. Similarly the power to assess against counsel the other party's attorneys' fees, approved as inherent in Roadway, stemmed from a court's conceded power to order reimbursement of the litigation expenses unnecessarily incurred by a party because of the bad faith conduct of the other party or its attorney. It simply does not follow from the Court's reaffirmation of these traditional inherent powers that there is also inherent power for the imposition of the costs of the forum, a sanction which has no historical antecedent and no statutory or Rule authorization.
 
 
 92
 Nor do I find persuasive the majority's attempt to rationalize its assumption of such power under the rubric of a court's need "to fashion tools that aid the court in getting on with the business of deciding cases." Maj.Op. at 567. Congress recognized the need for a process that would do precisely that, when it enacted the Rules Enabling Act, presently codified at 28 U.S.C. Sec. 2071 et seq. (1982). In holding that a district court may penalize attorney conduct that is not proscribed by any Federal Rule or even by any local rule, the majority circumvents the procedure that has been established for drafting and promulgating the Federal Rules. That procedure entails preparation and circulation of draft rules by a distinguished advisory committee assisted by a distinguished reporter; revision of such rules following public comment; review by a Standing Committee on Rules of Practice and Procedure; submission of such rules to the Supreme Court for its review; and transmission of the rules to Congress, which may permit them to go into effect by taking no action within 90 days, 28 U.S.C. Sec. 2072 (1982). See generally W. Brown, Federal Rulemaking: Problems and Possibilities 5-34 (Federal Judicial Center 1981).
 
 
 93
 The professed need for additional tools to assist courts in dealing with frivolous pleadings, discovery abuse, and other dilatory and costly litigation tactics[1] led to substantial amendments to the Federal Rules of Civil Procedure in 1983. These now provide the district courts with explicit authority to impose sanctions on attorneys as well as parties for unwarranted motions, pleadings, or other papers (Rule 11), for failure to comply with the strengthened provisions for pretrial conferences and orders (Rule 16(f)), and for abusive discovery requests, responses, or objections (Rule 26(g)). These expand upon the already existing variety of sanctions set forth in Rules 30(g), 37, 41(b), 45 and 55 governing depositions, discovery generally, dismissals, subpoenas, and default.
 
 
 94
 The district judge who entered the order on appeal has chosen, even without the imprimatur of a local rule, to establish a procedure under which attorneys must give the court notice of settlement at least two working days prior to the time set for jury selection or be subject to assessment of jury costs. See Nesco Design Group, Inc. v. Grace, 577 F.Supp. 414 (W.D.Pa.1983). Since even a local rule may not be used to effectuate basic procedural innovations, see Miner v. Atlass, 363 U.S. 641, 650, 80 S.Ct. 1300, 1306 4 L.Ed.2d 1462 (1960), it follows that an individual judge may not undertake on his or her own an innovation of this magnitude. As the Supreme Court has noted, the rulemaking procedure established by Congress is designed to assure that such innovations "shall be introduced only after mature consideration of informed opinion from all relevant quarters, with all the opportunities for comprehensive and integrated treatment which such consideration affords." Id. Thus the majority opinion not only permits judicial usurpation of Congress' power to prescribe sanctions, but also effectively permits an individual court to nullify the carefully designed procedure for judicial rulemaking.
 
 II.
 
 95
 In Gamble v. Pope & Talbot, Inc., 307 F.2d 729 (3d Cir.), cert. denied, 371 U.S. 888, 83 S.Ct. 187, 9 L.Ed.2d 123 (1962), which was the last time this court sitting in banc considered the authority of the district court to impose a statutorily unauthorized fine, Judge Hastie, whose concurrence was determinative, wrote that the district court, "although acting with the best intention, has exceeded its power by imposing a criminal sanction without legislative authority for conduct which did not amount to contempt of court." Id. at 733 (emphasis added). The majority does not meet Judge Hastie's objection head on, but instead, apparently relying on the inapplicable maxim that the greater includes the lesser, assumes that the courts' inherent power to punish contempt includes the power to punish conduct that falls short of contempt. Maj.Op. at 567. In so ruling, the majority overlooks the historical evolution of the strict limitations to the contempt power in this country. These developed in recognition that the power to punish summarily necessarily encroaches upon individual freedoms as well as the legislative and executive powers to define and enforce penalties.
 
 
 96
 In England, prior to the late 17th or early 18th centuries, summary process for contempt was exercised only in very limited cases. See Green v. United States, 356 U.S. 165, 202-07, 78 S.Ct. 632, 653-55, 2 L.Ed.2d 672 (1958) (Black, J., dissenting); R. Goldfarb, The Contempt Power, 14-15 (1963).[2] The subsequent enlargement of the contempt power by the English courts was adopted as well on this continent, despite the lack of authority therefor. See supra note 2. See also Frankfurter and Landis, Power to Regulate Contempts, 37 Harv.L.Rev. 1010, 1042-52 (1924).
 
 
 97
 The federal courts came to view the provision of Section 17 of The Judiciary Act of 1789 that federal courts "shall have power to ... punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same ...," 1 Stat. 83, as confirming a virtually untethered inherent power to punish summarily those acts considered by the judge to be contemptuous. As was certain to occur, this led to serious abuses.
 
 
 98
 The action of Judge James Peck in 1826 punishing an attorney for contempt for his publication of a critical article about the judge's conduct in a case then on appeal, see Nelles & King, Contempt By Publication in The United States, 28 Colum.L.Rev. 401, 423-30 (1928), triggered the beginning of a long struggle to confine the contempt power. Judge Peck was impeached by the House. Although the Senate, after a year of proceedings, narrowly failed to convict him, in 1831 Congress enacted a contempt statute that was a "drastic curtailment of the contempt power." Bloom v. Illinois, 391 U.S. 194, 203, 88 S.Ct. 1477, 1483, 20 L.Ed.2d 522 (1968); see Frankfurter and Landis, 37 Harv.L.Rev. at 1026-27. The Act of 1831, which is largely the same as current 18 U.S.C. Sec. 401, stated that,
 
 
 99
 the power of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court, shall not be construed to extend to any cases except the misbehaviour of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice, the misbehaviour of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts.
 
 
 100
 Act of Mar. 2, 1831, 4 Stat. 487 (emphasis added).
 
 
 101
 In Ex parte Robinson, 86 U.S. (19 Wall.) 505, 22 L.Ed. 205 (1874), the Supreme Court upheld the Act of 1831, concluding that although the power to punish for contempt is inherent in the courts, this power may be and was limited by Congress. Id. at 510-11, 22 L.Ed. 205. The Supreme Court vacated the sanction of disbarment imposed by the trial court for contempt because that sanction was neither a "fine" nor "imprisonment" under the contempt statute and could not be added to the punishments available for contempt. The Court concluded that the Act of 1831 limited the powers of the district courts, saying:
 
 
 102
 the power of these courts in the punishments of contempts can only be exercised to insure order and decorum in their presence, to secure faithfulness on the part of their officers in their official transactions, and to enforce obedience to their lawful orders, judgments, and processes.
 
 
 103
 Id. at 511, 22 L.Ed. 205. The Court stated that the separate but circumscribed power of the lower courts to disbar attorneys may be exercised only where the attorney has been shown to be unfit as a member of the profession. Justice Field, writing for the Court, stated that, "the [contempt statute] is a limitation upon the manner in which the power shall be exercised, and must be held to be a negation of all other modes of punishment." Id. at 512, 22 L.Ed. 205 (emphasis added). This language is equally applicable to this case.
 
 
 104
 Although the Court occasionally relapsed in its view of scope of the contempt power under the Act, see, e.g., Toledo Newspaper Co. v. United States, 247 U.S. 402, 418, 38 S.Ct. 560, 563 62 L.Ed.2d 1186 (1918), overruled by Nye v. United States, 313 U.S. 33, 47-52, 61 S.Ct. 810, 815-817, 85 L.Ed. 1172 (1941), it is now firmly established that the Act, "which 'narrowly confined' and 'substantially curtailed' the authority to punish contempt summarily, has continued to the present day as the basis for the general power to punish criminal contempt." Bloom v. Illinois, 391 U.S. at 203-04, 88 S.Ct. at 1482-83 (citation and footnote omitted). Congress' right to enact a statute requiring a jury trial for contempt has been upheld, Michaelson v. United States ex rel. Chicago, St. Paul, Minneapolis & Omaha Railway, 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed. 162 (1924), as has been the limitation on summary contempt imposed by Rule 42 of the Federal Rules of Criminal Procedure. See Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965), overruling Brown v. United States, 359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959).
 
 
 105
 As the Court has noted, the "apprehensions about the unbridled power to punish summarily for contempt are reflected in the march of events in both Congress and the courts since our Constitution was adopted." Bloom v. Illinois, 391 U.S. at 202, 88 S.Ct. at 1482. It further stated:
 
 
 106
 This course of events demonstrates the unwisdom of vesting the judiciary with completely untrammeled power to punish contempt, and makes clear the need for effective safeguards against that power's abuse.
 
 
 107
 Id. at 207, 88 S.Ct. at 1485. The scope of a court's power to punish summarily has been limited in recognition both of the proper role of Congress in regulating procedure and establishing punishments and of the principles of procedural fairness embedded in the Constitution, which require adversary proceedings including notice and an opportunity to be heard unless the events occurred within the view of the court. See Cooke v. United States, 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925).
 
 
 108
 In this case, the district court did not treat attorney Tighe's conduct as contempt of court, conduct that impedes or obstructs the administration of justice, even though that standard is broad enough to encompass, in appropriate circumstances, such abuses as an attorney's tardiness, failure to appear, and disobedience of court orders. See Chapman v. Pacific Telephone & Telegraph Co., 613 F.2d 193, 195-97 (9th Cir.1979); United States v. Marx, 553 F.2d 874, 876 (4th Cir.1977); In re Niblack, 476 F.2d 930, 933 (D.C.Cir.) (per curiam), cert. denied, 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973); Comment, Financial Penalties Imposed Directly Against Attorneys in Litigation Without Resort to the Contempt Power, 26 U.C.L.A.L.Rev. 855, 861 (1979). However, "willfulness is an element of criminal contempt which must be proved beyond a reasonable doubt," Pennsylvania v. Local Union 542, International Union of Operating Engineers, 552 F.2d 498, 510 (3d Cir.), cert. denied, 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977), and contempt citations may not be given to attorneys whose dilatoriness or other obstruction of court processes was not shown to be willful. See, e.g., DeVaughn v. District of Columbia, 628 F.2d 205, 207 (D.C.Cir.1980) (per curiam) (late filing of pretrial statement); In re Farquhar, 492 F.2d 561, 564 (D.C.Cir.1973) (tardiness at reconvened trial).
 
 
 109
 Since the attorney's behavior in this case has not been found to fall within any of three categories of behavior specified in the contempt statute, the district court's summary treatment of his actions contravenes the express and hard-won limitation of that statute, which provides:
 
 
 110
 A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as--
 
 
 111
 (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
 
 
 112
 ....
 
 
 113
 (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.
 
 
 114
 18 U.S.C. Sec. 401 (1982) (emphasis added).
 
 
 115
 The majority's holding writes out of the contempt statute the words limiting the contempt power to the specified offenses "and none other". It does so under the misguided belief that because the power to impose a fine on attorneys may be useful, it may be exercised. Justice Black, dissenting in Green v. United States, explained the danger of such utilitarian arguments:
 
 
 116
 "Necessity" is often used in this context as convenient or desirable. But since we are dealing with an asserted power which derogates from and is fundamentally inconsistent with our ordinary, constitutionally prescribed methods of proceeding ... "necessity," if it can justify at all, must at least refer to a situation where the extraordinary power to punish by summary process is clearly indispensable to the enforcement of court decrees and the orderly administration of justice. Or as this Court has repeatedly phrased it, the courts in punishing contempts should be rigorously restricted to the "least possible power adequate to the end proposed." See, e.g., In re Michael, 326 U.S. 224, 227 [66 S.Ct. 78, 79, 90 L.Ed. 30].
 
 
 117
 Stark necessity is an impressive and often compelling thing, but unfortunately it has all too often been claimed loosely and without warrant in the law, as elsewhere, to justify that which in truth is unjustifiable.
 
 
 118
 356 U.S. at 213, 78 S.Ct. at 658-659. In light of the ample sanctions otherwise available, the need to curb attorney abuse of trial and pretrial procedures is not so great as to countenance the extension of the courts' "inherent" powers to include the power to fine attorneys for conduct that does not rise to the level of contempt.
 
 III.
 
 119
 I find the majority's response to these concerns lamentably inadequate. It hardly advances judicial analysis to suggest that if the district courts did not have the flexibility to impose a "modest monetary sanction on counsel", they would be likely to impose "a harsh and potentially inequitable response to attorney misconduct." Maj.Op. at 567. When a district court has inappropriately utilized the harsh and inequitable sanction of dismissal, we have not hesitated to reverse. See, e.g., Scarborough v. Eubanks, 747 F.2d 871, 874-75, 878 (3d Cir.1984); Donnelly v. Johns-Manville Sales Corp., 677 F.2d 339, 341-43 (3d Cir.1982). Nor am I persuaded by the argument that the inevitable impact of my position would be to limit the power to impose sanctions by the courts of appeals as well as the district courts. Maj.Op. at 566. While the majority may flinch from such a restriction, I certainly do not. I do not believe that our ability to perform the task to which we are all dedicated, that of providing as just a result as possible in the cases before us under procedures that are fair and equitable, will be markedly improved if we add the summary power to impose fines on attorneys to our already considerable array of powers.
 
 
 120
 Because there are few effective checks on the judiciary in our democratic form of government, we must be particularly sensitive to the need to check ourselves. There is no more difficult task before judges than to voluntarily decline to expand their own powers. It may appear that the fine imposed in this case, a mere $390, is too trifling to presage an arrogant usurpation by the judiciary of the powers of the other branches. But the principle that underlies the majority's affirmation of the district court's power has no built-in limitation. If a district court chooses to rule that attorneys who tried a lengthy libel or antitrust case before settling it could and should have reached a settlement before trial, the majority's holding could authorize that court to impose on the trial attorneys the heavy expenses of jurors' fees, and presumably their food and other expenses as well.
 
 
 121
 Nor is the majority opinion limited to jurors' fees or other forum costs. Indeed, in Gamble v. Pope & Talbot, 307 F.2d at 730, which the majority now overrules, the assessment against the dilatory attorney was candidly denominated as "a fine, of one hundred dollars' payable to the United States" and was unrelated to any forum costs. While I am confident in the restraint of the district judges in our circuit, we cannot be blind to the lesson of history that unchecked power may lead to abuse. Because it may take too long for Congress or the Supreme Court to close the Pandora's Box the majority has opened, I dissent.
 
 
 
 [1]
 The court appointed Robert J. Bartow, Professor, Temple University School of Law, to serve as amicus curiae and to assert a position, in the interest of informed decision-making, adverse to that of appellants
 
 
 [2]
 Taxable costs under Sec. 1920 include: (1) fees of the clerk and marshal; (2) fees of the court reporter for all or any part of the stenographer's transcript necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and copies of papers necessarily obtained for use in the case; (5) docket fees under Sec. 1923 of Title 28; (6) compensation of court-appointed experts, compensation of interpreters, and salaries, fees, expenses and costs of special interpretation services under Sec. 1828 of Title 28
 
 
 [3]
 Congress amended Sec. 1927 in 1980 to include the taxing of attorney's fees
 
 
 [4]
 Thus, we need not address whether an attorney's delay of settlement may constitute multiplying the proceedings and what mental state is required by the terms "unreasonably" and "vexatiously."
 
 
 [5]
 See R. Rodes, K. Ripple & C. Mooney, Sanctions Imposable for Violations of the Federal Rules of Civil Procedure 179 n. 466 (Federal Judicial Center 1981) [hereinafter Sanctions Imposable ]
 
 
 [6]
 There is a plethora of state court cases regarding the powers of the state judiciary
 
 
 [7]
 Levin & Amsterdam, supra, 107 U.Pa.L.Rev. at 33, note that courts have relied on this concept to void legislation requiring a written opinion in every case, Vaughan v. Harp, 49 Ark. 160, 4 S.W. 751 (1887); declaring within what time every case must be heard, Atchison, Topeka & Santa Fe Railway Co. v. Long, 122 Okla. 86, 251 P. 486 (1926); denying a court the power to issue its mandate until a prescribed period of time after the judgment has elapsed even if this renders the judgment meaningless, Burton v. Mayer, 274 Ky. 263, 118 S.W.2d 547 (1938); or providing for the automatic disqualification of judges simply upon the application of a party, State ex rel. Bushman v. Vandenberg, 203 Ore. 326, 329, 280 P.2d 344 (1955). We do not pass on the validity of these holdings but only note that courts have sought to carve out a sphere of minimal autonomy based upon separation of powers notions
 
 
 [8]
 Although now codified at 18 U.S.C. Sec. 401 (1982) and in Fed.R.Crim.P. 42, the contempt power is rooted principally in the inherent power of the judiciary. See Levine v. United States, 362 U.S. 610, 615, 80 S.Ct. 1038, 1042, 4 L.Ed.2d 989 (1960); Ex parte Robinson, 86 U.S. (19 Wall.) at 510, 22 L.Ed. 205; Sanctions Imposable, supra note 5, at 74; Comment, Financial Penalties Imposed Directly Against Attorneys in Litigation Without Resort to the Contempt Power, 26 UCLA L.Rev. 855, 878 (1979)
 
 
 [9]
 The long-standing practice of the federal courts of making such appointment has been codified in Fed.R.Civ.P. 53. See Reed v. Cleveland Board of Education, 607 F.2d 737, 743 n. 1 (6th Cir.1979)
 
 
 [10]
 Traditionally courts have treated the attorney as the client's agent so that the attorney's acts and omissions legally bind the client. Sanctions Imposable, supra note 5, at 70; see generally Link, 370 U.S. at 633-34, 82 S.Ct. at 1390-91. Because this approach ignores the realities of the lawyer-client relationship, see Comment, Involuntary Dismissal for Disobedience or Delay: The Plaintiff's Plight, 34 U.Chi.L.Rev. 922, 929 (1967), there has been a trend to seek to impose penalties upon only the offending lawyer
 
 
 [11]
 See, e.g., D.Col.R. 11; D.Del.R. 5.5(D); N.D.Ill.Civ.R. 11; W.D.La.R. 5(g); D.N.J.Gen.R. 20(G); D.N.M.R. 13(e); W.D.Tenn.R. 6(b); E.D.Va.R. 20(e)
 
 
 [12]
 To permit the district court to impose monetary sanctions for attorney misconduct without affording notice and a hearing, as is required in the context of contempt, might tend to undercut the contempt sanction's procedural safeguards. See Fed.R.Crim.P. 42(b)
 
 
 [1]
 "In all cases not provided for by rule, the district courts may regulate their practice in any manner not inconsistent with these rules." See Link v. Wabash Railroad Co., 370 U.S. 626, 633, n. 8, 82 S.Ct. 1386, 1390 n. 8, 8 L.Ed.2d 734 (1962)
 
 
 [2]
 I note that within our circuit, the district courts of Delaware and New Jersey have chosen to promulgate local rules to establish the type of sanction at issue here. See D.Del.R. 5.5(D); D.N.J.Gen.R. 20(G)
 
 
 [1]
 See, e.g., R. Rodes, K. Ripple & C. Mooney, Sanctions Imposable for Violations of the Federal Rules of Civil Procedure (1981) (Report to the Federal Judicial Center); Peckham, The Federal Judge as a Case Manager: The New Role in Guiding a Case from Filing to Disposition, 69 Calif.L.Rev. 770, 801-02 (1981); Discovery Sanctions: A Judicial Perspective, 67 Calif.L.Rev. 264 (1979)
 
 
 [2]
 As Justice Black explained in his now vindicated dissent:
 The myth of immemorial usage has been exploded by recent scholarship as a mere fiction. Instead it seems clear that until at least the late Seventeenth or early Eighteenth Century the English courts, with the sole exception of the extraordinary and ill-famed Court of Star Chamber whose arbitrary procedures and gross excesses brought forth many of the safeguards included in our Constitution, neither had nor claimed power to punish contempts committed out of court by summary process. Prior to this period such contempts were tried in the normal and regular course of the criminal law, including trial by jury. After the Star Chamber was abolished in 1641 the summary contempt procedures utilized by that odious instrument of tyranny slowly began to seep into the common-law courts where they were embraced by judges not averse to enhancing their own power.
 Green v. United States, 356 U.S. at 202-03, 78 S.Ct. at 653 (Black J., dissenting) (citations and footnote omitted). The majority's conclusion in Green, reaffirming that trial by jury was not required for criminal contempts was overturned by the Court in Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), holding that a jury trial was required to impose imprisonment beyond that for petty offenses.