2005 UT 44

Paul C. BURKE, Petitioner,

v.

Honorable Leslie LEWIS, Respondent.

The Doctors' Company, G. Gregory Drezga, M.D., Heidi Judd, personally as the natural parent and guardian of Athan Montgomery for and on behalf of Athan Montgomery, Real Parties In Interest.

No. 20040500.

Supreme Court of Utah.

July 12, 2005.

Paul C. Burke, Salt Lake City, for petitioner and real-party-in-interest.

G. Gregory Drezga, M.D. Brent M. Johnson, Salt Lake City, for respondent.

Jaryl L. Rencher, Vaun B. Hall, Salt Lake City, for real-party-in-interest The Doctors' Company.

James W. McConkie, Bradley H. Parker, Jonathon T. Tichy, Salt Lake City, for real-party-in-interest Heidi Judd.

DURRANT, Justice:

¶ 1 In addressing this petition for extraordinary relief, we must determine whether a district court may, without express authorization by statute or rule, appropriately appoint counsel for an absent, nonindigent civil litigant. We conclude that, in this case, the district court operated within the bounds of its discretion when it ordered such an appointment. This conclusion is based upon our determination that a court's inherent power to appoint counsel is not limited to situations involving indigency and our decision that, despite ethical concerns raised by the litigant's absence, the appointed attorney's good-faith compliance with the appointment order will not constitute a violation of the rules of professional conduct.

## BACKGROUND

¶ 2 Athan Montgomery suffered serious injuries at the time of his birth, including paralysis and brain damage, as the result of a botched forceps delivery performed by Dr. Gregory Drezga. Heidi Judd, as the parent and guardian of Montgomery, subsequently filed a medical malpractice suit against Drezga on Montgomery's behalf, ultimately obtaining a jury award of nearly $2.3 million.[1]

¶ 3 Although the exact timing of his departure is uncertain, Drezga apparently disappeared from Utah soon after Montgomery's birth, but before the malpractice suit was filed against him. Despite Drezga's absence, The Doctors' Company ("TDC"), Drezga's malpractice insurer, hired counsel for Drezga

and prepared to mount a defense against Judd's malpractice claim.

¶ 4 However, before trial commenced in the malpractice action, TDC filed a separate action against Drezga, seeking a declaration that TDC had no duty to defend Drezga in the malpractice suit because Drezga had failed to comply with his contractual duty to cooperate in his own defense. TDC named Judd as a codefendant in the declaratory action, but asserted no separate claims against Judd.

¶ 5 After uncovering documentation indicating that Drezga may have omitted material information in his application for insurance, TDC amended its complaint in the declaratory action, seeking retroactive invalidation of the insurance contract. Although TDC received the district court's permission to serve the initial complaint by publication, service of the amended complaint was initially accepted by David Slagle, the attorney representing Drezga in the malpractice action. However, Slagle subsequently sent a letter to the district court, expressing his belief that he could not properly accept service on behalf of Drezga and purporting to withdraw his acceptance of service. While concerns about the effectiveness of service lingered in the background, TDC pursued its new legal theory, arguing in a summary judgment motion that the district court should declare the insurance contract invalid as a matter of law.

¶ 6 Judd, no doubt realizing that a retroactive invalidation of Drezga's malpractice insurance policy would effectively preclude the possibility of collecting any judgment awarded in the malpractice action, successfully opposed TDC's summary judgment motion. However, when TDC subsequently renewed its earlier request for a default judgment against Drezga, citing his failure to appear in the declaratory action, Judd filed a motion asking the court to appoint counsel to represent Drezga's interests in the case.

¶ 7 For over two years, Judd and TDC argued over the propriety of appointing

---

1. Upholding the constitutionality of a legislatively enacted limitation on noneconomic damages recoverable in medical malpractice cases, we subsequently reduced the jury award by $1 million. *See Judd v. Drezga*, 2004 UT 91, ¶¶ 3, 39, 103 P.3d 135.

counsel for Drezga. TDC contended that any attorney undertaking representation of Drezga would necessarily violate the Utah Rules of Professional Conduct because no lawyer-client relationship can be formed with an absent, incommunicado, individual and the appointed attorney would be unable to comply with communication obligations imposed by those rules. According to TDC, the ethical problems inherent in commencing representation of an absent client rendered inappropriate any attempt to appoint counsel for Drezga. Judd and TDC supplied the district court with opinions from four individuals, all knowledgeable in matters of legal ethics, who addressed the potential ethical quandaries an appointed attorney would face in undertaking representation of Drezga. Two of those individuals concluded that representation of Drezga would be ethical, while two reached the opposite conclusion.

¶ 8 After allowing extensive briefing, and after considering the countervailing arguments raised by TDC and Judd, the district court appointed the current petitioner, Paul C. Burke, to represent Drezga. Burke sought appellate review of the appointment order, but his appeal was dismissed on procedural grounds by the court of appeals. Citing his inability to gain speedy review of the appointment order through normal appellate channels, Burke filed the current Petition for Extraordinary Relief pursuant to rule 65B of the Utah Rules of Civil Procedure, requesting that we review the district court's order of appointment.[2] We have jurisdiction pursuant to Utah Code section 78-2-2(2) (2002).

## STANDARD OF REVIEW

¶ 9 Our rules of civil procedure provide that, "[w]here no other plain, speedy and adequate remedy is available, a person may petition the court for extraordinary relief." Utah R. Civ. P. 65B(a). Extraordinary relief may be granted if, among other grounds detailed in rule 65B, the petitioner can establish that a lower court "exceeded its jurisdiction or abused its discretion." *Id.* 65B(d)(2)(A).

¶ 10 In the present case, no party contends that the district court acted beyond the bounds of its jurisdiction by issuing the appointment order. Rather, the issue in this case, properly framed, is whether the district court abused its discretion by choosing to wield its appointment power under the circumstances. *See, e.g., Hutchings v. State,* 2003 UT 52, ¶ 20, 84 P.3d 1150 (appointment of counsel in civil postconviction relief context is left to the discretion of the district court); *State v. Arguelles,* 2003 UT 1, ¶ 83, 63 P.3d 731 (mentioning courts' discretion to appoint amicus counsel); *see also Hill v. SmithKline Beecham Corp.,* 393 F.3d 1111, 1115 (10th Cir.2004) (appointment of counsel for an indigent prisoner in a civil action is a matter left to the discretion of the district court). Consequently, we will review the district court's action only to determine whether the court abused its discretion by appointing Burke.

¶ 11 We note that the parties disagree as to whether an abuse of discretion must be particularly egregious before extraordinary relief becomes appropriate. Interpreting our prior decisions addressing petitions for extraordinary relief, the Utah Court of Appeals has held that " 'abuse of discretion' for [extraordinary writs] must be much more blatant than the garden variety 'abuse of discretion' featured in routine appellate review." *State v. Stirba,* 972 P.2d 918, 922 (Utah Ct.App.1998). TDC argues, however, that our case law is properly read as creating two distinct abuse of discretion standards of review variously applicable to petitions for extraordinary relief, a garden variety standard and a gross and flagrant standard. Under this approach, when utilizing the garden variety abuse of discretion standard, we will find that discretion has been abused if a district court takes any action beyond the sphere of its discretion. In contrast, when utilizing a gross and flagrant abuse of discretion standard, we will find that discretion has been abused only if a district court greatly exceeds the limits of its discretion. As a result, when utilizing the gross and flagrant standard,

2. Given the procedural posture of the current controversy, Judge Leslie Lewis is properly designated the respondent to Burke's petition.

However, Judd and TDC, as real parties in interest, have also participated in briefing and arguing the merits of Burke's petition.

some actions exceeding the bounds of discretion will go uncorrected.

¶ 12 TDC argues that our prior decisions do not hold that a gross and flagrant abuse of discretion standard should be used in every situation involving a petition for extraordinary relief. Rather, according to TDC, the gross and flagrant abuse of discretion standard is applicable only in situations where the legislature has abrogated the right to pursue normal appellate review. It is unclear whether TDC's assertion is accurate. *Compare Kawamoto v. Fratto*, 2000 UT 6, ¶ 7, 994 P.2d 187 (arguably utilizing a garden variety abuse of discretion standard even though a statutory bar on appeals was present), *with Renn v. Utah State Bd. of Pardons*, 904 P.2d 677, 683–84 (Utah 1995) (utilizing a gross and flagrant abuse of discretion standard when a statutory prohibition against appellate review was present). *See also Panos v. Third Judicial Dist. Court*, 2004 UT 87, ¶ 7, 103 P.3d 695 (identifying concern about the appropriateness of the review standard utilized in *Kawamoto* ).

¶ 13 According to TDC, we applied the gross and flagrant abuse standard in *Renn* not simply because extraordinary relief was sought, but due to our concern that use of the garden variety abuse of discretion standard in such situations would allow parties to essentially circumvent statutory limitations on appellate review. Therefore, TDC argues, when no statutory abrogation of the right to seek appellate review exists, the garden variety abuse of discretion standard should govern.

¶ 14 We acknowledge and appreciate the parties' arguments relative to the appropriate standard of review. However, in this case, we have no need to resolve the lingering uncertainty as to the proper standard to apply in the extraordinary writ context because we conclude that the district court acted within the bounds of its discretion. Our determination that there was no abuse of discretion makes inescapable the conclusion that the district court did not grossly and flagrantly abuse its discretion.

¶ 15 In undertaking our review, we grant no deference to the district court's legal conclusions. *Salt Lake Child & Family Therapy Clinic, Inc. v. Frederick*, 890 P.2d 1017, 1019 (Utah 1995); *see also Stirba*, 972 P.2d at 920 ("[We limit our review of Judge Stirba's actions to deciding whether she has regularly exercised her authority, ... grant[ing] no deference to her interpretation and application of [statutory law]."). Additionally, any factual findings serving as a predicate for the district court's actions will be disturbed only if they are clearly erroneous. *See* Utah R. Civ. P. 52(a). Having explained the appropriate standard of review, we now turn to our analysis of the issues raised in Burke's petition.

## ANALYSIS

¶ 16 The issue in this case is whether a district court may, without express authorization by statute or rule, appropriately appoint counsel for an absent, nonindigent civil litigant.[3] No party has referred us to any case in which the propriety of such an appointment has been analyzed. We too have been unable to locate any authority directly on point.[4] Although such an appointment is cer-

**3.** In addition to appointing Burke to represent Drezga, the district court's order mandated that TDC pay all attorney fees associated with Drezga's representation. TDC has twice sought review of the attorney fees portion of the appointment order by petitioning this court for extraordinary relief as well as for permission to pursue an interlocutory appeal. We denied both of TDC's requests without comment. In briefing the issues raised by Burke's petition, TDC once again requests that we review whether the attorney fees portion of the order was proper. However, the petition filed by Burke did not seek review of the attorney fees portion of the district court's order. In fact, in his petition, Burke expressly contrasted the relief he was pursuing with that sought by TDC in its earlier request to pursue an interlocutory appeal, which asked this court to review the attorney fees portion of the order. Additionally, at oral argument, Burke stated that his petition, by design, focuses on ethical rather than financial issues. Therefore, the appropriateness of requiring TDC to assume the full burden of Drezga's attorney fees is not properly before us, and we decline to address it. *See Osborne v. Adoption Ctr. of Choice*, 2003 UT 15, ¶ 24, 70 P.3d 58 (declining to address arguments raised in a rule 65B petitioner's brief that were not contained in the original petition).

**4.** We do note that rule 244 of the Texas Rules of Civil Procedure requires courts to appoint coun-

tainly novel, that reality does not necessarily dictate the outcome of the present controversy. *See Flynn v. Hubbard,* 782 F.2d 1084, 1087 (1st Cir.1986) (stating that the lack of any case law addressing the propriety of a specific action does not foreclose a determination that the action is appropriate). There is, after all, a critical distinction between undertaking an action in conflict with precedent and undertaking an unprecedented action. That said, the absence of case law addressing an appointment of this kind indicates that a careful analysis of the scope and nature of the appointment power is necessary to determine whether the district court abused its discretion by exercising its appointment authority in the present situation.

¶ 17 TDC argues that we should conclude that the district court abused its discretion because (1) it is simply improper for a court to appoint an attorney for a nonindigent civil litigant, and (2) a court cannot order an attorney to represent a client when that representation will necessarily result in a violation of the Utah Rules of Professional Conduct. We address each of these grounds in turn.

## I. APPOINTMENT OF COUNSEL FOR A NONINDIGENT CIVIL LITIGANT

¶ 18 It appears from the record that the district court's decision to appoint counsel rested on two distinct grounds: (1) the district court's conclusion that our opinion in *Chatterton v. Walker,* 938 P.2d 255 (Utah 1997), requires insurance companies to provide or finance independent representation of their insureds when an adverse litigation relationship exists between insurer and insured, and (2) the inherent authority of courts to appoint counsel to ensure that the interests of justice are adequately served. We address each justification in turn.

### A. The Applicability of Chatterton v. Walker

¶ 19 In issuing its appointment order, the district court accepted, at least to some degree, Judd's contention below that our decision in *Chatterton* requires TDC to provide or finance independent counsel for Drezga in the declaratory action. *Chatterton* involved a suit against an uninsured motorist filed by an individual who sustained damages in an automobile accident. *Id.* at 256. The uninsured motorist had apparently left the state and was therefore served by publication. *Id.* at 256–57. The plaintiff's insurance company sought leave to intervene in the action, claiming that a judgment against the uninsured motorist would render it liable to the plaintiff under the uninsured motorist provision of the insurance contract. *Id.* After intervention was granted, the insurance company answered the plaintiff's complaint and asserted that the plaintiff, its own insured, was partially liable for the accident due to malfunctioning brake lights. *Id.* at 257. In other words, in *Chatterton,* the insurance company took a position adverse to its insured on the very subject upon which it had a contractual duty to defend its insured, specifically, the insured's liability for the accident. To remedy the conflict created by the insurance company's intervention, we held that the insurance company could be required to provide or finance independent representation of the insured. *Id.* at 262. However, we went on to state that "[t]he provision of counsel or reimbursement of expenses should be directly related to litigation of the issue of the uninsured motorist's negligence and the damages resulting from that negligence and should not implicate collateral issues relating to the insurer's intervention." *Id.*

¶ 20 TDC argues that our holding in *Chatterton* is limited to those situations where an insurance company is adverse to its insured as to an issue implicating the insurance company's contractual duty to defend the in-

---

sel for a civil defendant who has been served by publication and who has not answered the complaint or otherwise entered an appearance within the prescribed time. Tex.R. Civ. P. 244 *see Isaac v. Westheimer Colony Ass'n,* 933 S.W.2d 588, 591 (Tex.App.1996) ("The purpose of the portion of rule 244 requiring the appointment of an attor-

ney ad litem is to provide a non-appearing defendant effective representation."). However, the cases discussing appointments made pursuant to that rule are of limited value here, as in Utah, an appointment of this nature is not required or even expressly authorized by rule.

sured, a situation unlike the present case. We agree.

¶ 21 The present case presents a type of conflict entirely different from that at issue in *Chatterton*. Unlike the situation in *Chatterton*, TDC's efforts to declare the insurance contract void do not necessarily implicate a contractual duty on the part of TDC to defend Drezga in the declaratory action. In other words, in the declaratory action, the insurer is not necessarily playing the role of accuser and defender simultaneously. Rather, the dispute is centered on whether insurance coverage even exists. Consequently, we conclude that *Chatterton* is not directly applicable to the present situation and neither meaningfully supports nor undermines the appointment decision made by the district court.

¶ 22 Judd, in her brief before this court, acknowledges as much, referring to *Chatterton* as a "red herring" and relying primarily on the district court's inherent appointment power in advocating the propriety of Burke's appointment. Consistent with Judd's current argument, the record reveals that the district court did not rely solely on *Chatterton* when issuing the appointment order. For example, when denying TDC's request that the appointment order be reconsidered, the district court stated that "[t]he Court is confident that fair play and the interest of justice, *as well as* the legal reasons set forth in the Court's prior opinions, dictate that counsel be appointed." (Emphasis added.) Because we conclude that *Chatterton* has little, if any, application to the present controversy, we now examine whether the district court's order can be justified as an exercise of the court's inherent appointment power.

### B. The Inherent Appointment Power

¶ 23 Our case law has long acknowledged that courts possess inherent powers to ensure the pursuit of a just process and result. For example, in *Peterson v. Evans,* we stated that "it has always been held, regardless of express statutory authority, that courts of general jurisdiction have the inherent power to make and enforce all necessary rules and orders calculated to enforce the orderly conduct of their business and secure justice between parties litigant." 55 Utah 505, 188 P. 152, 153 (1920). That language is in accord with the contemporaneous conclusion of the United States Supreme Court in *Ex parte Peterson,* 253 U.S. 300, 312, 40 S.Ct. 543, 64 L.Ed. 919 (1920), that "[c]ourts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties." *See also id.* at 313, 40 S.Ct. 543 (stating that courts possess the authority to seek aid in carrying out judicial duties and that "[w]hether such aid shall be sought is ordinarily within the discretion of the trial judge"); *Anderson v. Dunn,* 19 U.S.(6 Wheat) 204, 227, 5 L.Ed. 242 (1821) ("[All] Courts of justice are universally acknowledged to be vested, by their very creation, with the power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates and ... to preserve themselves and their officers from the approach and insults of pollution."). The principle represented by the above-quoted language has been repeatedly reaffirmed by this court. *See, e.g., Chen v. Stewart,* 2004 UT 82, ¶ 39, 100 P.3d 1177 ("Defendants erroneously assume that the sole source of the court's power is rule 53 of the Utah Rules of Civil Procedure. However, ... the trial court has broad equitable power...."); *Griffith v. Griffith,* 1999 UT 78, ¶ 13, 985 P.2d 255 (" 'It is undoubtedly true that courts of general and superior jurisdiction possess certain inherent powers not derived from any statute. Among these are the power to ... direct and control its officers, including attorneys as such ....' " (quoting *In re Evans,* 42 Utah 282, 130 P. 217, 224–25 (1913))).

¶ 24 Although its analysis is centered on the federal justice system, *Bothwell v. Republic Tobacco Co.,* 912 F.Supp. 1221 (D.Neb.1995), provides a helpful and thorough examination of the inherent authority possessed by courts and the manner in which that general authority relates specifically to the appointment power. The *Bothwell* court commences its analysis by outlining three separate categories of inherent judicial authority: (1) powers necessary to maintain

independence from other branches of government, (2) powers necessary to exercise all other vested powers, and (3) powers to ensure "'the pursuit of a just result.'" *Id.* at 1226 (quoting *Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 563 (3d Cir.1985)).[5] After identifying the three general categories of inherent authority possessed by courts, the *Bothwell* court concluded that, although the power to appoint counsel falls most readily into the third category, the appointment power actually furthers all of the functions covered by the three identified categories. *Id.* at 1227. Having so concluded, the *Bothwell* court then made the broad pronouncement that, while there may not be a constitutional right to counsel in the context of a civil dispute, "counsel nevertheless may be necessary in a particular civil proceeding to ensure fairness and justice in the proceeding and to bring about a fair and just outcome." *Id.* (citing *Merritt v. Faulkner*, 697 F.2d 761, 764 (7th Cir.1983)); *see also Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 594 (Tex.1996) ("[I]n some exceptional cases, the public and private interests at stake are such that the administration of justice may best be served by appointing a lawyer to represent an indigent civil litigant."); *Cache County v. Lauritzen*, 810 P.2d 494, 498 (Utah Ct.App.1991) (recognizing "the inherent authority of courts to appoint counsel when the need arises").

¶ 25 TDC correctly points out that the majority of decisions discussing the propriety of appointment of counsel in the civil context expressly mention indigency as a primary factor justifying such an appointment. In fact, even those cases that do not expressly mention indigency when commenting on the scope of the appointment power implicitly rely on indigency as a key factor justifying the appointment of counsel. *See id.* (citing *Wash. County v. Day*, 22 Utah 2d 6, 447 P.2d 189, 191 (1968) (discussing the inherent appointment power and strongly implying that indigency is a critical factor in appointment decisions)). However, we are unaware of any authority that circumscribes the appointment power such that it can only operate to remedy the obvious inequities present when an indigent civil litigant seeks access to the courts. Significantly, the language courts use when discussing the inherent appointment authority is broadly cast and typically unadorned with equivocations or limitations, evincing a recognition that the existence of a broad, necessarily amorphous power is essential to the effective pursuit of the judicial obligation to provide justice. *See, e.g., Bothwell*, 912 F.Supp. at 1227 ("[C]ounsel ... may be necessary in a particular civil proceeding to ensure fairness and justice in the proceeding and to bring about a fair and just outcome."); *Gibson v. Tolbert*, 102 S.W.3d 710, 712 (Tex.2003) (stating that the Texas Supreme Court has "not addressed any limits to the courts' discretionary authority to appoint counsel" other than holding that appointment is acceptable when "exceptional circumstances exist"); *Lauritzen*, 810 P.2d at 498 (counsel can be appointed "when the need arises"); *cf. Eash*, 757 F.2d at 563 (stating that inherent judicial powers derived from "necessity" are "necessary only in the sense of being highly useful in the pursuit of a just result"). We have been referred to no language, and we have discovered none, that purports to identify or set limits to the appointment authority implicated here; we are certainly unaware of any language expressing the position that courts lack appointment power until the possibility of indigency is raised. *See Eash*, 757 F.2d at 561 (the concept of inherent judicial powers "has been described as nebulous and its bounds as 'shadowy'").

¶ 26 Given the above discussion, we conclude that appointment of counsel for a non-indigent civil litigant is not excluded per se from the sphere of a district court's authority. Even so, TDC and Burke still question whether the appointment of counsel for an absent litigant is acceptable because, they argue, appointed counsel will necessarily violate the Utah Rules of Professional Conduct simply by complying with the appointment order. We do not discount the gravity of such a question. It is of paramount impor-

---

5. In undertaking its analysis of the appointment power, the *Bothwell* court relied heavily on the Third Circuit's decision in *Eash*, which held that a district court had inherent authority to impose jury empaneling costs on an attorney as a form of sanction. *Eash*, 757 F.2d at 568.

tance that judges wield their appointment power wisely and judiciously and that judges avoid leading officers of the court down a path that runs counter to ethical principles.

¶ 27 However, unlike TDC, we believe that Burke is able to obey the district court's appointment order without running afoul of the Utah Rules of Professional Conduct. For example, although we recognize it is a remote possibility, Burke may be able to locate Drezga and assume normal lawyer-client relations, which would dissipate all of the concerns raised by both Burke and TDC. Failing that outcome, we are nevertheless of the opinion that the rules of professional conduct are flexible enough to allow Burke to serve Drezga's interests in the most effective manner permitted by the unusual circumstances of this case. The reasoning behind this conclusion is outlined below.

## II. COMPLIANCE WITH THE APPOINTMENT ORDER DOES NOT NECESSITATE A VIOLATION OF THE RULES OF PROFESSIONAL CONDUCT

¶ 28 Perhaps the overarching concern prompting the present petition is Burke's understandable unease with the potential ethical ramifications implicit in representing an absent individual. In this regard, Burke questions whether the district court, driven by its "equitable instincts," may have inadvertently compelled him to undertake a representation that is incompatible with the Utah Rules of Professional Conduct. Because "[t]his court ... has a special interest in the administration of the Rules of Professional Conduct," *Spratley v. State Farm Mut. Auto. Ins. Co.*, 2003 UT 39, ¶ 8, 78 P.3d 603, we accept Burke's invitation to address the ethical implications of his appointment.

¶ 29 Initially, we note that the Utah Rules of Professional Conduct are "rules of reason .... [that] should be interpreted with reference to the purpose of the legal representation and of the law itself." Utah R. Prof'l Conduct Scope. Flexibility in the application of the rules is necessary, as no set of rules or guidelines can "exhaust the moral and ethical considerations that should inform a lawyer." *Id.* As the rules correctly point out, "no worthwhile human activity can be completely defined by legal rules." *Id.* As a result, "[t]he Rules simply provide a framework for the ethical practice of law." *Id.* The principle that the rules of professional conduct should be applied in a manner reasonable under the circumstances is of special importance here, as there is no indication that the drafters of the rules contemplated the ethical implications of representing an absent client.

¶ 30 In fact, it is fair to say that the rules generally operate on the assumption that clients will be able and willing to actively participate in their representation. Building upon that assumption, the Utah Rules of Professional Conduct contain multiple provisions that impose an ethical duty on the part of attorneys to consult and communicate with their clients. *See, e.g.,* Utah R. Prof'l Conduct 1.2 ("A lawyer shall abide by a client's decisions concerning the objectives of representation ... and shall consult with the client as to the means by which they are to be pursued."); *id.* 1.4 ("A lawyer shall keep a client reasonably informed about the status of a matter[.] ... A lawyer shall explain a matter to the extent reasonably necessary to enable the client to make informed decisions regarding the representation.").

¶ 31 TDC argues that Burke cannot represent Drezga without violating the rules that require lawyers to communicate with their clients and, therefore, that any representation under the circumstances is contrary to the rules of professional conduct. However, just because representation of Drezga will not neatly accord with the general assumptions underlying the communication requirements contained in the rules of professional conduct, it does not necessarily follow that the rules prohibit the representation entirely. Such an unyielding application of the rules runs counter to the principle that the rules of professional conduct are rules of reason to be applied to myriad factual settings in a flexible fashion. *See* Restatement (Third) of The Law Governing Lawyers § 20 cmt. c. (2000) ("[A] standard of reasonableness under the circumstances determines the appropriate measure of consultation."). In fact, the principle that only reasonable communication un-

der the circumstances is required allowed TDC to ethically proceed in its defense of Drezga in the underlying malpractice action. It seems clear that the communication rules were not followed to the letter during the course of the malpractice litigation, but no party has contended that representing Drezga in the malpractice action was unethical for that reason.

¶ 32 TDC argues, however, that there is more at stake in the present situation than a mere inability to keep Drezga informed about the status of his case. Specifically, TDC contends that representation of Drezga is inappropriate because a lawyer-client relationship has not been consensually formed between Burke and Drezga. According to TDC, Drezga, by securing malpractice insurance, consented to any representation necessitated by the commencement of a malpractice suit. TDC argues that Drezga has not supplied any comparable form of consent in the present action, preventing the formation of a lawyer-client relationship for the purposes of its suit against Drezga. The lack of that relationship, according to TDC, is what truly distinguishes the representation of Drezga in the malpractice action from the representation of Drezga in the current declaratory action, making the former ethical and the latter unethical.

 ¶ 33 TDC's concerns are undoubtedly legitimate. In fact, the ethical anxiety caused by the lack of express consent to the representation, coupled with the inability to communicate with an absent litigant, prompted the Utah State Bar Ethics Advisory Opinion Committee ("Ethics Advisory Committee") to recently issue an advisory opinion [6] concluding that initiating representation of

an absent client would be contrary to the Utah Rules of Professional Conduct. *See* Utah State Bar Ethics Advisory Opinion Committee, Op. 04–01A (Dec. 2, 2004) (replacing and superceding Op. 04–01 (Mar. 29, 2004)).[7] The advisory opinion addressed a situation in which an employer asked its attorney to undertake representation of its absent former employee in order to avoid the entry of a default judgment against the employee that could potentially be used in later proceedings against the employer. Although the analysis conducted by the Ethics Advisory Committee is thorough and illuminating, the fact scenario it addresses is distinct from that in the current case, in which a court has issued an order appointing counsel for the absent litigant. As discussed below, the presence of a court order nullifies the primary concern driving the Ethics Advisory Committee's analysis in Opinion 04–01A, the absence of a lawyer-client relationship.

¶ 34 It is well established that the lawyer-client relationship is essentially one of agency and cannot be established without either the express or implied consent of the client. *See Margulies by Margulies v. Upchurch,* 696 P.2d 1195, 1200 (Utah 1985); Restatement (Third) of The Law Governing Lawyers § 14. Nevertheless, there are situations in which a "nonconsensual" [8] lawyer-client relationship can be formed. *See* Restatement (Third) The Law Governing Lawyers § 14 cmt. g. According to the Restatement, a lawyer-client relationship arises when "a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person" and the lawyer either manifests consent or fails to manifest lack of consent such "that the person reasonably relies on the lawyer to provide the services," or when "a tribunal

---

**6.** As this court is charged with the ultimate duty of overseeing the conduct of attorneys practicing law in this state, we are not bound by opinions issued by the Ethics Advisory Committee. *See* Utah Const. art. VIII, § 4. Nevertheless, the analyses contained in the committee's opinions provide a rich vein of material worthy of examination.

**7.** Initially, in a 10–3 opinion, the Ethics Advisory Committee determined that limited representation of an absent litigant could ethically be pursued. That opinion was superceded by Opinion 04–01A, in which the Ethics Advisory Committee,

though acknowledging that the issue was a close call for several members, unanimously reached the opposite conclusion.

**8.** The term "nonconsensual" is somewhat misleading, as the relationship is deemed formed through a type of implied consent. The term is used when, for example, a court appoints a lawyer to represent an individual lacking the capacity to reject the lawyer's services. *See* Restatement(Third) of The Law Governing Lawyers § 14 cmt. g. (entitled "Nonconsensual relationship: appointed counsel").

with power to do so appoints the lawyer to provide the services." *Id.; see also id.* cmt. g. ("When a court appoints a lawyer to represent a person, that person's consent may ordinarily be assumed absent the person's rejection of the lawyer's services.").

¶ 35 As previously discussed, we conclude that the district court does possess the authority to appoint Burke to represent Drezga's interests in the declaratory action. The order of appointment itself serves as an official determination that Drezga's consent to the representation may be properly implied.[9] However, TDC argues emphatically that Drezga's consent cannot be implied, as no one knows whether Drezga would desire to defend himself against the declaratory judgment action or whether he would prefer to allow TDC to obtain a default judgment. However, the district court has expressed its concern that issuing a default judgment in this case may not be appropriate, as litigation has proceeded and TDC's motion for summary judgment has already been denied. If the possibility of a default judgment is removed and a trial on the merits of TDC's claim is unavoidable, it seems beyond contention that Drezga would desire a vigorous defense to be mounted on his behalf. In fact, even if the entry of a default judgment remains a possibility, an issue upon which we express no opinion, we cannot say that the district court unreasonably concluded that Drezga would desire to defend himself against TDC's claims. TDC argues that a default judgment may be more advantageous to Drezga than a loss on the merits because a loss on the merits could negatively affect Drezga's ability to gain a medical license in another state. However, as the district court noted, there is sound reason to believe that Drezga would desire his malpractice insurance policy to remain in place, especially given the significant liability he now faces.

¶ 36 Given the presence of a court order creating a nonconsensual lawyer-client relationship, we conclude that Burke can defend Drezga in the declaratory action without violating the Utah Rules of Professional Con-

duct. We recognize that additional ethical issues may need to be resolved as Burke commences his representation of Drezga, but we are confident that the district court can capably address and resolve those concerns as they arise.

■ ¶ 37 Although we do not anticipate that Burke will offend the rules of professional conduct while representing Drezga, we do wish to provide Burke with the assurance that, so long as his actions as Drezga's advocate are undertaken in a good-faith effort to comply with the district court's order of appointment, he cannot be subjected to disciplinary action. The Ethics Advisory Committee has previously implied as much, but we now hold that this is the case. In Ethics Advisory Committee Opinion 107 (Feb. 15, 1992), the Ethics Advisory Committee stated that it would be "unlikely that the Utah State Bar would pursue disciplinary action" against a lawyer who complies with an appointment order that may cause a violation of the rules of professional conduct. We feel that a more categorical statement is warranted, as we can comprehend no situation in which a lawyer should be subject to discipline for complying in good faith with an order of appointment. In situations where an appointment raises ethical concerns, a lawyer, through no action of his or her own, is thrust into circumstances in which conflicting duties demand seemingly incompatible actions. Having so placed a lawyer in the mire, it offends fundamental notions of fairness to think that the lawyer can be subject to punishment regardless of which duty he or she chooses to serve. Consequently, we hold that good-faith compliance with an appointment order provides lawyers with a safe harbor in which they can be free from exposure to disciplinary action.

## CONCLUSION

¶ 38 In this case, the district court, after a careful analysis of the factors affecting its appointment decision, determined that appointment of counsel was the best means of effectuating a just process and a fair result and that Drezga's consent to such represen-

---

**9.** The district court expressly acknowledged this determination, stating that "the Court in its discretion presumes that a defendant under similar circumstances to defendant Drezga would expressly agree to be represented by the attorney that the Court selects...."

tation could be fairly implied. We are not persuaded that the district court's order requires Burke to violate the Utah Rules of Professional Conduct or that the district court otherwise abused its discretion in reaching its conclusion. However, given the multitude of factors that a district court must weigh before determining whether appointment of counsel is appropriate, our decision in this matter is, by necessity, inextricably linked to the particular facts presented by this case. Consequently, we do not hold that appointment of counsel is generally an acceptable practice whenever an innocent third party may be subject to adverse repercussions if a judgment is entered against an absent civil litigant.

¶ 39 Indeed, in this case there are unusual factors that are not likely to be readily reproduced in future controversies. For example, in the present case, the request for appointment was made by an actual party to the litigation and not by a third party whose connection to the underlying proceeding is tenuous or otherwise indirect. Additionally, the present case involves a considerable amount of confusion as to the effectiveness of service and the extent of the role played by David Slagle, the attorney retained by TDC to defend Drezga in the malpractice action. Finally, due to the manner in which this litigation has unfolded, there are doubts as to whether a default judgment can be entered in favor of TDC even if Drezga remains unrepresented and fails to appear in the action. This possibility may make a trial on the merits of TDC's claims unavoidable. Although the district court may have pursued other options to resolve the quandaries present in this case, we are unpersuaded that the court abused its discretion by following the course it did. Therefore, we decline to relieve appointed counsel from the burdens imposed by that order.

¶ 40 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.